611 A.2d 1046

Jacob FRAIDIN, et al.

v.

Andre R. WEITZMAN, et al.

Andre R. WEITZMAN, et al.

v.

Lawrence D. COPPEL, et al.

No. 1428, Sept. Term, 1991.

Court of Special Appeals of Maryland.

Sept. 4, 1992.

Nevett Steele, Jr. of Towson, for appellants, Fraidin, Pacific Mortg. and North American Credit Corp.

Patrick A. O'Doherty (Amy J. Muffolett and O'Doherty, Nead & Hoffman on the brief), Baltimore, for appellants, Weitzman and Braiterman, P.A.

Andrew Jay Graham (Kathleen A. Birrane and Kram & Graham, P.A., on the brief), Baltimore, for appellees, Coppel, Gordon, Feinblatt, etc.

Joel M. Savits (David B. Stratton and Jordan, Coyne, Savits & Lopata, on the brief), Baltimore, for appellees, Weinstock and Weinberger, etc.

Argued before WILNER, C.J., and BISHOP and ALPERT, JJ.

BISHOP, Judge.

## INTRODUCTION

In this opinion we dispose of two appeals that have been consolidated. The first appeal, filed by Jacob Fraidin (Fraidin) and his corporations, Pacific Mortgage & Investment Group, Ltd. and North American Credit Corporation (the Corporations), is from a judgment entered after a jury awarded compensatory and punitive damages against Fraidin and the Corporations in favor of Sheldon H. Braiterman, P.A. (Braiterman, P.A.) and André R. Weitzman (Weitzman), appellees.

The second appeal, filed by Braiterman, P.A. and Weitzman, is from a judgment entered in favor of defendants below, appellees, Melvyn J. Weinstock (Weinstock), his law firm, Weinberger, Weinstock, Sagner, Stevan & Harris, P.A. (Stevan & Harris) and Lawrence D. Coppel (Coppel) and his law firm, Gordon, Feinblatt, Rothman, Hoffberger & Hollander (Gordon, Feinblatt).

As a prerequisite to understanding the issues involved in the case *sub judice*, it is necessary to relate the background of the underlying case out of which this appeal arose.

On May 24, 1982, Ray Dorman (Dorman) and Margarette Dorman (Mrs. Dorman) (collectively the Dormans) hired

Sheldon H. Braiterman (Braiterman), James D. Johnson (Johnson), and André R. Weitzman, of Braiterman & Johnson, P.A., to represent them in an action against Fraidin and the Corporations. The Dormans executed a Power of Attorney and Contingent Fee Arrangement (the Contract) that provided they were to pay their attorneys ⅓ "if terminated without suit," 40 percent "if suit is filed but there is no trial," and 50 percent "if suit is tried on all amounts recovered by settlement or verdict." The Contract further provided that the Dormans were to reimburse their attorneys for expenses advanced, including court costs.

On April 1, 1985, Weitzman started his own law firm. The Dormans executed a new Contract, dated April 10, 1985, with the same fee arrangement but appointing only Weitzman as their attorney. Fraidin and the Corporations employed Weinstock, of Stevan & Harris, to represent him in the defense of the Dormans' lawsuit. On September 23, 1985, the jury returned a verdict in favor of the Dormans against Fraidin and the Corporations and awarded the Dormans $366,949.86 in compensatory and punitive damages, plus interest and costs. The present litigation involves the fee the Dormans owed Braiterman, P.A. and Weitzman as a result of the litigation between the Dormans and Fraidin which was settled directly with the Dormans by Fraidin.

Braiterman & Johnson P.A. and Weitzman initiated this suit in the Circuit Court for Baltimore City by filing a Complaint against: the Dormans, Fraidin, the Corporations, Weinstock and Stevan & Harris, Coppel, and Gordon, Feinblatt. Count I alleged that the Dormans breached the terms of the Contract. In the alternative to Count I, Count II alleged that the Dormans were required to pay Braiterman & Johnson P.A. and Weitzman for the reasonable value of their services under the theory of quantum meruit. Count III alleged that the Dormans defrauded Braiterman & Johnson P.A. and Weitzman. Count IV alleged that Fraidin, the Corporations, Weinstock, Stevan & Harris, Coppel, and Gordon, Feinblatt tortiously interfered with the Contract. Count V alleged that all of the defendants—

Fraidin, the Corporations, Weinstock, Stevan & Harris, Coppel, Gordon, Feinblatt, and the Dormans—engaged in a civil conspiracy to accomplish the breach of the Contract. Punitive damages were sought under Counts IV and V. The court (Noel, J.) later granted Fraidin's motion for judgment on Count II (quantum meruit). Although it is unclear from the record what the disposition was of Count III (fraud), the parties have indicated it was dismissed.

Trial initially commenced in January 1990, but ended in a mistrial. After the second trial, commenced on September 18, 1990, the jury returned a verdict for Braiterman, P.A. and Weitzman against the Dormans, Fraidin, and the Corporations; it returned a verdict in favor of defendants Weinstock, Stevan & Harris, Coppel, and Gordon, Feinblatt (collectively Lawyer Defendants). The jury assessed the following damages: Count I (breach of contract)—$12,500 "plus interest" in compensatory damages each to Braiterman, P.A. and Weitzman; Count IV (tortious interference with contract)—$91,737.47 "plus interest" in compensatory damages each to Braiterman, P.A. and Weitzman; Count V (Civil Conspiracy)—the jury determined that the Dormans, Fraidin, and the Corporations, but not the Lawyer Defendants, conspired to interfere with the Contract, but that Braiterman, P.A. and Weitzman did not sustain any damages as a result of the conspiracy. The jury determined punitive damages should be assessed against Fraidin and the Corporations, but not against the Dormans. A second phase of the trial was commenced to determine the amount of punitive damages. The jury assessed punitive damages against Fraidin and the Corporations in favor of Weitzman in the amount of $2,500,000, and in favor of Sheldon Braiterman, P.A. in the amount of $500,000. Although Braiterman & Johnson P.A. is the party named as the plaintiff in the complaint, the verdict sheet indicates punitive damages were assessed in favor of "Plaintiff, Sheldon Braiterman, P.A." Possibly, there was an amendment during trial, but we find no explanation of the discrepancy in the record or the briefs. In this opinion we will refer to Braiterman, P.A.

To say that the trial was exhaustive is an understatement. The trial lasted for 29 days, and the record extract before this Court consumes over 4,000 pages. The parties disputed much of the evidence. We relate the facts as we have garnered them from the record.

## FACTS

Shortly after obtaining judgment for the Dormans in *Dorman v. Fraidin*, Weitzman began efforts to collect from Fraidin by filing Interrogatories in Aid of Enforcement of Judgment and a Request for Production of Documents in Aid of Execution. As a result, Weitzman obtained Fraidin's application to Atlantic Bonding Company, Inc., filed in the summer of 1985, in which Fraidin, under oath, stated combined personal and corporate assets slightly in excess of $3,000,000. The brief of Braiterman, P.A. and Weitzman refers to another financial statement made by Fraidin to the Western Surety Company showing Fraidin's net worth to be $3,125,000 as of June 30, 1985. Our review of this document and the accompanying trial testimony indicates that the document showed Fraidin's net worth to be $3,158,300 as of June 30, 1985. In November 1985, settlement discussions regarding the judgment in *Dorman v. Fraidin* developed. These negotiations are central to the allegations of Braiterman, P.A. and Weitzman that the defendants tortiously interfered with the Contract, therefore we recount these negotiations in detail.

On November 1, 1985, Fraidin, without Weinstock, met with Weitzman and Braiterman to discuss settlement. Fraidin testified he offered to settle the underlying action for $100,000 over five years, or $60,000 payable immediately. Fraidin's post-trial motions in the underlying action were denied on November 7, 1985.

On November 12, 1985, Fraidin hired additional counsel from Gordon, Feinblatt to handle the post-judgment proceedings in *Dorman v. Fraidin*, and to advise him of his options in light of the judgment, including the possibility of

filing bankruptcy. Coppel, a specialist in bankruptcy at Gordon, Feinblatt, was assigned Fraidin's case. Coppel familiarized himself with the case: he met with Fraidin, obtained the pleadings from Weinstock, reviewed the facts, and arranged for his partner, Lawrence S. Greenwald, a specialist in litigation, to prepare an appeal. Coppel testified that Weinstock continued to represent the Corporations even after Fraidin retained Gordon, Feinblatt. Fraidin's understanding was that Gordon, Feinblatt represented him and the Corporations for appeal of the judgment in *Dorman v. Fraidin.* Nevertheless, correspondence from Coppel to Weinstock indicates that Gordon, Feinblatt represented Fraidin only, and that Weinstock continued to represent the Corporations. On November 14, 1985, Fraidin, accompanied by Weinstock, met with Braiterman and Weitzman to discuss Fraidin's assets. On November 18th or 20th, Weinstock, on behalf of Fraidin, called Weitzman to discuss the possibility of providing security for the appeal with a nonrefundable escrow fund in the amount of $20,000 which the Dormans would keep, regardless of the outcome of the appeal.

Eventually, there was direct contact between Fraidin and the Dormans, although the parties disputed who initiated the contact. It was clear, however, that, on November 25, 1985, Dorman telephoned Weinstock's office and left a message for Fraidin with Weinstock's secretary that Dorman: "[j]ust wants his money back and he'll settle." Fraidin testified that Weinstock delivered the message to him either that day or the next, and that Fraidin called Dorman and arranged to meet with him on Thanksgiving Day, November 28, 1985. Dorman's deposition testimony, which was introduced at trial, indicated that Fraidin telephoned Dorman, and that it was only after this call that Dorman telephoned Weinstock's office. Fraidin denied initiating the contact. Dorman testified at his deposition that he never placed another call to Weinstock's office, and that he never spoke with any of the attorneys there, only with the secretary with whom he left the message. Weinstock testified

that, after Dorman's call, he instructed his employees not to transfer Dorman's calls to him, and not to give out Fraidin's telephone number. Dorman testified at his deposition that he never spoke to any attorney about a settlement. Weitzman's testimony confirmed that neither Weinstock, nor any member of his firm, ever contacted the Dormans directly.

Regardless of who initiated the contact, the uncontroverted evidence was that, on either November 25th or 26th, Fraidin and Weinstock discussed whether it was permissible for Fraidin to contact Dorman directly to discuss settlement. Weinstock advised Fraidin he could talk directly to Dorman. On November 26, 1985, Fraidin questioned Coppel about the propriety of Fraidin's negotiating directly with the Dormans. Coppel explained his understanding of the law to Fraidin: that it is permissible for the parties to a lawsuit to settle directly with each other. Coppel testified that, notwithstanding his opinion on the legality of direct settlement between Fraidin and the Dormans, he counseled Fraidin against such a settlement. In his testimony, Fraidin confirmed that Coppel gave him this advice. On November 27, 1985, Dorman informed Weitzman that Fraidin had called Dorman to set up a meeting. Weitzman advised Dorman to meet with Fraidin only if Weitzman were present.

On Thanksgiving Day, Fraidin met with the Dormans at a bar in east Baltimore. Dorman's deposition testimony indicated the following series of events. Fraidin met Dorman, Weitzman, and Johnson at Tom & Olive's bar. Dorman was drinking that night. Fraidin told Dorman he had $20,000 from "his people" out in the car, and he was willing to settle for that. Fraidin did not show Dorman the "flash money." Dorman responded he would not settle for $20,000, and suggested a figure of $50,000, and a low interest loan of $120,000 he could use to purchase Tom & Olive's bar. Fraidin declined Dorman's offer and insinuated he could have Dorman "bumped off" if he refused to settle. Fraidin also stated that, if Dorman settled, he would not have to pay Weitzman, and that Fraidin would keep the

amount of the settlement confidential. The trial testimony differed significantly from Dorman's deposition testimony. Weitzman's version of events follows. Weitzman went to Tom & Olive's bar with Johnson. Johnson went inside, but Weitzman waited outside. Twenty minutes later Johnson emerged from the bar and told Weitzman that Dorman was very drunk, and that Fraidin, the Dormans, and the bar owner were having a meeting upstairs where he was not allowed. Weitzman telephoned into the bar and reached Mrs. Dorman, who told him Fraidin had some loan papers regarding the bar. Weitzman asked to speak to Dorman. Dorman said Fraidin was talking to him about "selling [sic] the case." At this point, Weitzman and Johnson went inside to the meeting. Weitzman glanced at the papers on the table before Fraidin put them away. They looked like loan applications. When Dorman went downstairs, Weitzman told Fraidin he should not be attempting to settle with a drunk, and that Fraidin was asking for another law suit.

The following day, Fraidin told Coppel about the meeting in the bar. According to Weitzman, Coppel objected to Weitzman's having met with Fraidin without Coppel's being present, and Coppel threatened to institute disciplinary action against Weitzman.

The Saturday after Thanksgiving, November 28, 1985, Fraidin met with Dorman and Weitzman at a McDonald's (restaurant).

According to Dorman's deposition testimony, admitted into evidence at trial, Fraidin made it clear at the meeting that he would not deal with Dorman in Weitzman's presence.

A bizarre conversation involving Dorman and Coppel occurred on December 3, 1985. Dorman, apparently a problem drinker, called Weitzman and demanded to speak with Coppel. Weitzman telephoned Coppel and informed him that Dorman wanted to speak to him. According to Coppel's notes, Dorman, who was apparently drunk, told him that: Fraidin had threatened the Dormans' lives; Fraidin

tried to bribe Dorman into not paying Weitzman and Braiterman; and Fraidin said that Weinstock had taken $20,000 out of his own bank account for the settlement. Dorman made comments about meeting Fraidin in a bar and asked Coppel to attend the meeting. Coppel did not attend any meeting.

On December 4, 1985, the Dormans sent a letter discharging Weitzman and Braiterman as their attorneys. The letter read, verbatim:

"To whom it may consern [sic]. I Ray Dorman & Margarette Dorman. on this fourth day of December 1985 do here by Fire and dismiss Aundra Weitzman. and Sheldon Braiterman. from the case which they were handling for us with Jacob Fraidin."

Dorman stated at his deposition that Fraidin dictated the letter to him over the telephone, and that Mrs. Dorman "typed it up." Dorman testified: "Fraidin told me that I had to write a letter discharging Mr. Weitzman before he could settle the case without Mr. Weitzman present or another attorney." Dorman explained that Fraidin told him to make three copies: one for Weitzman, one for his own records, and one that Fraidin would send a cab down to pick up. Weitzman stated at trial that he never received this letter from the Dormans, and that Weitzman learned of the letter only through a telephone conversation with Weinstock.

On December 5, 1985, Weitzman wrote Coppel a letter advising him that Dorman was suffering from an extreme case of alcoholism. Weitzman cautioned that "a settlement with Mr. Dorman while under the influence of alcohol and its side effects will only create new litigation in place of or in addition to that now pending." Weitzman suggested that Coppel should urge Fraidin to withdraw his efforts to communicate with the Dormans.

On December 6, 1985, Weitzman met with Dorman and obtained a handwritten statement from Dorman disclaiming the December 4th letter to Weitzman and Braiterman, and

asserting that the Dormans had not settled the case. Fraidin testified that he met with Weitzman in the parking lot of the Mount Washington Tavern on December 8, 1985, and told Weitzman that he was going to settle with the Dormans the next day. Fraidin maintained that he invited Weitzman to the settlement, and that Weitzman made his own decision not to be present.

On the morning of December 9, 1985, Weitzman called Dorman from a deposition he was attending in Rockville. Dorman was very excited and told Weitzman he was not going to make any deal with Fraidin unless it was for $175,000. While still in Rockville, Weitzman received a call from Coppel. Coppel said there was a signed letter firing Weitzman, and asked Weitzman if he had evidence of his authority to act for the Dormans. Through a paralegal in his office, Weitzman arranged for Coppel to receive a copy of the Dormans' handwritten statement of December 6, 1985.

On the afternoon of December 9, 1985, the Dormans settled with Fraidin for $50,000 cash. The settlement proceedings were recorded and transcribed, and a Notice of Satisfaction of Judgment was executed by the Dormans and later filed with the court. At settlement, Fraidin had the Dormans reaffirm the discharge of Weitzman and Braiterman as their lawyers by initialing and dating the discharge letter of December 4th. Fraidin also had the Dormans sign a confidentiality agreement in which they agreed not to disclose the amount of the cash settlement to third parties.

Neither Weinstock nor Coppel attended the settlement. Coppel's time records show three telephone calls with Fraidin on December 9, 1985, but the conversations were not admitted into evidence as a result of Fraidin's assertion of attorney-client privilege. Mrs. Dorman testified that sometime after settlement she placed a call to Weitzman's house for her husband. She handed the phone to Dorman, and a heated discussion ensued. Mrs. Dorman testified that when Dorman hung up the telephone he said he had offered to pay Weitzman 50 percent of $50,000, but that Weitzman had

rejected that as "peanuts." Weitzman denied that the "peanuts" conversation ever occurred.

On December 10, 1985, Weinstock called Braiterman and, with Weitzman on the extension, advised that Fraidin had settled with the Dormans. The following day, Weitzman and Braiterman filed a Motion to Set Aside the Order of Satisfaction. On December 13, 1985, Weitzman wrote two letters, one to the Dormans, and the other to Judge Hinkel, the presiding judge in *Dorman v. Fraidin.* He advised the Dormans that he had filed a motion to set aside the order of satisfaction. He also requested a copy of a statement made by the Dormans, which he learned about from Weinstock and Coppel, in which the Dormans purportedly repudiated testimony they gave at the *Dorman v. Fraidin* trial. The letter to Judge Hinkel advised the judge that Weinstock and Coppel had copies of a statement by the Dormans that repudiated their trial testimony, and a transcript of the settlement. On December 18th, Weitzman and Braiterman received a certified letter signed by the Dormans dated December 14, 1985 that stated:

"We have advised you previously that you have been fired and no longer have the athorety [sic] to repersent [sic] us. We insest [sic] that you dismiss your motion to set aside order of satisfaction and not file any more pleadings on our behalf."

On December 16th, Lawrence Greenwald, of Gordon, Feinblatt, wrote Weitzman to reaffirm Coppel's advice that Weitzman not communicate directly with Fraidin, and to advise him against continuing collection proceedings and making defamatory statements about Fraidin or the Corporations—including furnishing copies of the motion to set aside the order of satisfaction to Fraidin's customers.

A hearing on the motion to set aside the order of satisfaction was held before Judge Hinkel. The Dormans testified that the settlement was voluntary and that they were satisfied with it. Judge Hinkel denied the motion to set aside the order of satisfaction. At the trial in the case *sub judice,* Weitzman presented evidence, in the form of Dor-

man's deposition testimony, that Fraidin hired an attorney for the Dormans to appear at the hearing on the motion to set aside the order of satisfaction, and that Fraidin told the Dormans what to say. Dorman testified, at his deposition, that he did not tell the truth in front of Judge Hinkel on December 26, 1986 because of threats Fraidin made against him.

Additional facts are included in our discussion of the issues.

## ISSUES PRESENTED

Appellants Fraidin and the Corporations present these issues:

### I. TORTIOUS INTERFERENCE

A. May a claim alleging tortious interference with a contractual relationship be based on an unethical and excessive fee agreement?

B. Does Braiterman, P.A. have standing to sue for tortious interference with contract, when Braiterman was not a party to the contract?

### II. EVIDENTIARY ISSUES

A. Did the trial court err in admitting evidence from the *Dorman v. Fraidin* trial?

B. Was Dorman's unsworn statement properly withdrawn from evidence?

### III. COMPENSATORY DAMAGES

A. Are compensatory damages restricted to 50 percent of the $50,000 settlement received by Dorman?

B. Should Fraidin and the Corporations receive credit on the judgments against them for $25,000—the amount of the judgment rendered against the Dormans for breach of contract?

## IV. PUNITIVE DAMAGES

A. When a tort arises from a contract and there is evidence that the sole motivating factor for the defendants' conduct was the desire to save money rather than the desire to deliberately injure the plaintiff, can a punitive damage award be upheld?

B. Does the punitive damage award against Fraidin and the Corporations comply with due process requirements?

C. When the jury based its punitive damage award on prejudicial and erroneously admitted evidence from a separate trial, must the punitive damage award be vacated?

## V. PREJUDGMENT INTEREST

Did the trial court abuse its discretion in awarding prejudgment interest to appellees?

## VI. MISTRIAL—RECUSAL

A. Does the bias of the trial judge, which resulted in the judge incarcerating Fraidin, without due process, warrant a mistrial?

B. Did the trial court err when it (a) refused to refer the motion for recusal to another judge and (b) ultimately denied the motion for recusal?

Appellants Braiterman, P.A. and Weitzman present the following issues in their appeal against appellees Weinstock and Stevan & Harris, and Coppel and Gordon, Feinblatt:

VII. Did the trial court err in permitting Coppel to withhold his testimony of some conversations with Fraidin and notes of all conversations with Fraidin concerning the events occurring between the parties to this case on the basis of attorney-client privilege, where Fraidin asserted at trial that he acted in reliance upon the advice of counsel, where portions of those conversations were voluntarily revealed by Fraidin and Coppel, and where the advice of counsel was used in the perpetration of the tort of interference with contract?

VIII. Did the trial court err in instructing the jury with incorrect and contradictory statements of law concerning an attorney's liability for aiding, encouraging, and assisting a client in the commission of the tort of interference with contract and liability for conspiring with his client to commit that tort?

## DISCUSSION

## FRAIDIN AND THE CORPORATIONS' APPEAL

### I. TORTIOUS INTERFERENCE

#### A. *The Contract*

The Contract the Dormans signed in May 1982 appointed Weitzman, Braiterman, and Johnson to represent them in their suit against Fraidin. As a fee for services, the Dormans agreed to pay their attorneys the following percentages "of all amounts recovered by settlement or verdict:" 33⅓ percent if the case terminated without suit; 40 percent if suit was filed and the case settled before trial; and 50 percent if the case was tried. The Dormans also agreed to reimburse their attorneys for expenses advanced. At trial Braiterman explained that it was his practice in 50 percent contingency fee cases to deduct the expenses and then calculate the fee, so that the lawyers never net more than the client. There was no additional fee for appellate work. In April 1985, Weitzman started his own law office. The Dormans executed a revised Contract containing the same fee arrangement but appointing only Weitzman as their attorney. The document purports to have been signed on April 10, 1985; however, under cross examination, Weitzman admitted that the new Contract was not signed until October 1985, after the trial in *Dorman v. Fraidin.* Weitzman did not explain the terms of the new Contract to the Dormans, and he did not give the Dormans a copy of the Contract.

As a threshold issue, appellants, Fraidin and the Corporations, ask whether "a claim alleging tortious interference

with a contractual relationship [can] be based on an unethical and excessive fee agreement." Appellants contend that the fee agreement violated public policy, and was, therefore, "unenforceable" and incapable of forming the basis of a suit for tortious interference with contract. Specifically appellants claim: 1) Weitzman's fee was excessive; 2) Weitzman had a greater stake in the litigation than the Dormans; 3) Weitzman obtained the Dormans' consent to the fee agreement in an improper and unethical manner; and 4) the power of attorney provision contained in the fee agreement gave Weitzman unlimited discretion to control the litigation.

A suit for tortious interference with contract does not depend upon whether the underlying agreement was "enforceable;" it depends upon whether the agreement was "valid." Only a valid agreement can support a claim for tortious interference with contract; an invalid agreement cannot. Thus, appellants' argument is that, because the fee provision was excessive, the contract between the Dormans and their attorneys was invalid and, consequently, not capable of serving as the basis of a suit for tortious interference with contract.

We disagree. Under the circumstances, the Contract was not excessive, rather, it was a valid contract capable of serving as the basis of a suit for tortious interference with contract. We explain.

The elements of tortious interference with contract are: 1) existence of a contract between plaintiff and a third party; 2) defendant's knowledge of that contract; 3) defendant's intentional interference with that contract; 4) breach of that contract by the third party; 5) resulting damages to the plaintiff. *Fowler v. Printers II*, 89 Md.App. 448, 466, 598 A.2d 794 (1991). Appellants' argument is directed at the first element of the tort. A valuable discussion of the type of contract that will support a claim for tortious interference is included in R. Gilbert, P. Gilbert & R. Gilbert, *Maryland Tort Law Handbook*, § 7.3 (1986):

"Obviously if there is no *valid* contract, one cannot be said to have interfered with its existence. Thus, if D interferes with an invalid agreement between P and O by inducing O to abandon pursuit of the invalid agreement, D is not liable to P."

(Citations omitted). (Emphasis added). A similar statement is contained in W. Page Keeton, *Prosser and Keeton on Torts* § 129 at 994–95 (5th ed. 1984):

"Virtually any type of contract is sufficient as the foundation of an action for procuring its breach. It must of course be *valid,* in force and effect, and not illegal as in restraint of trade, or otherwise opposed to public policy, so that the law will not aid in upholding it."

(Citations omitted).

Thus, the general rule is that "for there to be a right of action against one for contractual interference, there must be in existence a valid contract subject to that interference." *Armendariz v. Mora,* 553 S.W.2d 400 (1977) (emphasis added). *See also,* Annotation, *Interference with Invalid Contract,* 96 A.L.R.3d 1294, 1296–97 (1980) ("All of the cases in this annotation involving invalid contracts support the view that, regardless of the particular ground for invalidity ... there is no liability for interfering with an invalid contract.)

▮▮▮ Although a 50 percent contingency fee is high, the fee agreement was not excessive, or invalid, based on the facts of this case. In determining whether a particular fee agreement is excessive for disciplinary purposes, the following factors are considered:

"(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly. (2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer. (3) The fee customarily charged in the locality for similar legal services. (4) The amount involved and the results obtained. (5) The time limitations imposed by

the client or by the circumstances. (6) The nature and length of the professional relationship with the client. (7) The experience, reputation, and the ability of the lawyer or lawyers performing the services. (8) Whether the fee is fixed or contingent."

*Attorney Grievance Comm'n v. Wright,* 306 Md. 93, 97–98, 507 A.2d 618 (1986), quoting DR 2–106(B). Moreover, attorneys are not to acquire a "propriety interest" in any litigation conducted for a client. DR 5–103(A). Although the case *sub judice* does not involve attorney discipline, these factors are relevant to the extent that they express public policy. A contract that violates public policy is invalid. *State Farm Mut. Automobile Ins. Co. v. Nationwide Mut. Ins. Co.,* 307 Md. 631, 643, 516 A.2d 586 (1986). In Maryland, there is no *per se* rule regarding the reasonableness of attorneys' fees—each case is decided individually, on its facts. *See e.g., Attorney Grievance Comm'n v. Korotki,* 318 Md. 646, 569 A.2d 1224 (1990) (75% fee was excessive in this particular case).

In the case *sub judice,* the Contract provided for a fee of 50 percent only if the case were tried, otherwise, the fee was less than 50 percent. Because the fee was contingent, the Dormans' attorneys risked not receiving any compensation for their services if their efforts were unsuccessful. The 50 percent fee included appellate work. From what we are able to learn of the Dormans' case against Fraidin from the record, it does not appear to be routine, and the outcome was not a certainty. The Dormans' attorneys were skilled legal advocates who were familiar with the subject matter of the Dormans' case. In short, the fee, although high, was not excessive.

Appellants' other arguments regarding the validity of the Contract are not supported by the record. Appellant argues that the Contract gave Weitzman unlimited discretion over the Dormans' case and that the Dormans' consent to the agreement was improperly obtained. Contrary to appellants' assertion, the Contract did not authorize the Dormans' attorneys to settle the case. Moreover, appellants'

arguments regarding improprieties in the execution of the second fee agreement—not explaining the document, not giving the Dormans a copy, back-dating the agreement— ignore the fact that the second agreement was the same as the first, except that Weitzman was the only attorney.

In their reply brief, appellants argue that whether the fee agreement violated public policy is a question of law, not of fact, and should not have been decided by the jury. The jury instructions listed, almost verbatim, the factors in the disciplinary rules for determining whether a fee is reasonable. The jury was also advised that "it is generally improper for a lawyer's stake to exceed that of his client." Based upon these instructions, the jury found that Braiterman, P.A. and Weitzman had an enforceable contract with the Dormans.

Appellants have not directed our attention to any portion of the record evidencing their objection to the submission of the issue to the jury. In general, we do not decide issues that were not raised in the trial court. Md. Rule 8–131. *See also, Rose v. Paape,* 221 Md. 369, 379, 157 A.2d 618 (1960) (where a question was not presented until it was raised in the appellants' reply brief, the Court of Appeals refused to decide it because it was too late under the Rule). Therefore, we need not address whether the issue was properly submitted to the jury. Moreover, because we have determined that the Contract was valid and did not violate public policy, appellants' argument on this issue is moot.

B. *Standing of Braiterman, P.A.*

Appellants' next contention is that Braiterman, P.A. has no claim against them for tortious interference with contract because Braiterman did not have a contract with the Dormans. Appellants argue that because Braiterman was not a party to the second contract, and it replaced the first, Braiterman lacks standing to sue.

The first written contract appointed Weitzman, Braiterman and Johnson as attorneys for the Dormans. At that time, the attorneys were all members of Braiterman &

Johnson, P.A. When Weitzman left the practice, he took the Dormans' case with him, and a second contract was written appointing only Weitzman as the Dormans' attorney. Braiterman, P.A. and Weitzman maintain, however, that Braiterman remained involved in the case at the Dormans' request, and that, although not evidenced in writing, a contract for the provision of legal services existed between the Dormans and Braiterman.

Testimony with respect to Braiterman's involvement in the case was as follows. When Weitzman started his own practice, he took the Dormans' case with him, with Braiterman's approval. Weitzman and Braiterman agreed that they would share equally in any fees. Before and during the trial, Braiterman served as a consultant to Weitzman. After trial in *Dorman v. Fraidin*, Braiterman and Weitzman agreed, with the Dormans' consent, that Braiterman would enter his appearance and work with Weitzman on collection of the judgment. Weitzman testified that the Dormans authorized Braiterman to come back into the case, and they knew Braiterman was going to share the fee with Weitzman. A handwritten document signed by Weitzman and Braiterman, dated October 25, 1985, divided responsibilities for the post-trial legal work between Weitzman and Braiterman.

Whether an attorney client-relationship existed between the Dormans and Braiterman was a factual question. The jury found, by a preponderance of the evidence, that Braiterman, P.A. had a contract with the Dormans. Existence of an attorney-client relationship may be implied from the conduct of the parties; it does not depend on the execution of a formal contract, unless the parties so specify. *Crest Investment Trust, Inc. v. Comstock,* 23 Md.App. 280, 297, 327 A.2d 891 (1974), *cert. denied,* 274 Md. 726 (1975). The verdict of a jury on a question of fact is conclusive on appeal. *Fowler v. Benton,* 245 Md. 540, 545, 226 A.2d 556, *cert. denied,* 389 U.S. 851, 88 S.Ct. 42, 19 L.Ed.2d 119 (1967). It is not our function to inquire into the weight of the evidence, rather, we determine only whether there was

legally sufficient evidence to support the jury verdict. *Temoney v. State*, 290 Md. 251, 261–62, 429 A.2d 1018 (1981); *Gray v. Director, Patuxent Inst.*, 245 Md. 80, 84, 224 A.2d 879 (1966).

The facts viewed in the light most favorable to the prevailing party, Braiterman, P.A., are that Braiterman was listed as attorney on the initial contract signed by the Dormans. Although Weitzman took the Dormans' case when he left Braiterman, and a new contract was executed, Braiterman remained involved in an advisory capacity. Later, the Dormans authorized Braiterman's involvement to pursue collection of the judgment, and Braiterman did, in fact, try to collect the judgment. This evidence is legally sufficient for a jury to infer that Braiterman, P.A. had a contract with the Dormans.

## II. EVIDENTIARY ISSUES

### A. *Dorman v. Fraidin*

■■■ Prior to trial, Weinstock and Stevan & Harris, co-defendants with Fraidin below and appellees in the second appeal, submitted a motion in limine requesting that references to *Dorman v. Fraidin* be limited to: 1) the amount of the judgment; 2) the post-trial proceedings, such as motions, the appeal, and discovery in aid of execution; and 3) settlement negotiations. Other evidence from *Dorman v. Fraidin* was inadmissible. They argued that, because it was extrinsic evidence of collateral matters, its admission would unnecessarily lengthen the trial, confuse the facts and issues, and risk undue prejudice to the defendants. In addition, they contended that the other evidence was inadmissible impeachment evidence. The court denied the motion in limine and indicated that it "would grant a great deal of latitude in that because, without that, this [case] would make no sense." On appeal, appellants complain that the following were erroneously allowed: opening statements made by counsel for Braiterman, P.A. and Weitzman explaining the particulars of the loan that formed the basis of

the suit in *Dorman v. Fraidin;* questions asked of Fraidin by counsel for Braiterman, P.A. and Weitzman regarding Fraidin's businesses aimed at portraying Fraidin as a "moneylender;" introduction of a yellow page advertisement for one of the Corporations.

"We have observed many times that the reception of evidence is to a large degree entrusted to the discretion of the trial court and its action will seldom constitute grounds for reversal." *Attorney Grievance Comm'n v. Kerpelman,* 288 Md. 341, 359, 420 A.2d 940 (1980), *cert. denied,* 450 U.S. 970, 101 S.Ct. 1492, 67 L.Ed.2d 621 (1981); *State v. Conn,* 286 Md. 406, 425, 408 A.2d 700 (1979). Moreover, a trial judge has wide discretion "to control the course of the trial and the exercise of such discretion will not be reversed on appell[ate] review except in those rare cases where there has been a clear abuse of that discretion." *Thrifty Diversified, Inc. v. Searles,* 48 Md.App. 605, 615, 429 A.2d 270 (1981). *See also Board of County Comm'rs v. Dorcus,* 247 Md. 251, 261, 230 A.2d 656 (1967) ("Surveillance of counsel's argument to the jury is within the sound discretion of the trial judge[.]").

Appellants argue the trial court erroneously admitted irrelevant evidence from *Dorman v. Fraidin.* The admission of background evidence is a generally accepted exception to the relevancy requirement. *See* 1 Strong, *McCormick on Evidence* § 185, at 774 (4th ed. 1992) ("[C]onsiderable leeway is allowed even on direct examination for proof of facts that do not bear directly on the purely legal issues, but merely fill in the background of the narrative[.]"). The advisory committee note to Fed.R.Evid. 401 (relevance) states:

"Evidence which is essentially background in nature can scarcely be said to involve disputed matter, yet it is universally offered and admitted as an aid to understanding.

\* \* \*

A rule limiting admissibility to evidence directed to a controversial point would invite the exclusion of this

helpful evidence, or at least the raising of endless questions over its admission."

"[It is] always necessary to place a transaction or controversy into some sort of setting or framework before any sense can be made out of the evidence submitted to the jury." 1 Wigmore, *Evidence* § 9.1(3) at 660 (Tillers rev. 1983). The case *sub judice* involved a large cast of characters and a complicated set of facts. The trial court did not abuse its discretion in admitting evidence from *Dorman v. Fraidin* to provide the jury with a useful background to the current controversy.

### B. *Dorman's Statement of January 16, 1990*

At the beginning of the trial, counsel for Braiterman, P.A. and Weitzman read to the jury, as substantive evidence, Dorman's sworn deposition testimony. The admissibility of this evidence is not an issue. Dorman's deposition testimony contained a variety of statements that were damaging to appellants. On January 16, 1990, during the first trial that ended in a mistrial, Dorman made an unsworn statement in open court, but out of the presence of the jury, that he was drunk on the day of his deposition. During Fraidin's testimony, counsel for the Corporations introduced, over objection from counsel for Braiterman, P.A. and Weitzman, an excerpt from the transcript of the January 16th proceedings containing Dorman's statement that he was drunk during his deposition. Although the court initially admitted the statement, it withdrew the statement from evidence prior to giving the jury its final instructions. The court explained to the jury:

"Ladies and gentlemen, on October 26 there was exhibit number 2 of North American Credit Corporation and Pacific Investment Group. It was an unsworn statement made on January 16, 1990 by Mr. Dorman which said that he was drunk when his deposition was given. It came into evidence and I have since ruled that it was not proper for me to admit it into evidence and you are to disregard that statement in your deliberations and that statement

will not be taken into the jury room with you. It was my error to admit it initially, and I am correcting that error." Fraidin objected to the court's withdrawal of the statement from evidence. Appellants now argue that a new trial must be granted because the judge committed prejudicial error by withdrawing the statement. In their brief, appellants argue Dorman's statement that he was drunk was admissible to impeach Dorman, because it was a prior inconsistent statement, and because it was the admission of a party opponent.

In 6 McLain, *Maryland Evidence* § 806.1 (1987) the text writer explains:

"[If an out-of-court] declarant does not testify at trial, but his or her out-of-court statement has been admitted as substantive evidence, the court in its discretion may allow impeachment, and then rehabilitation, of the declarant."

The rule is justified in 3 A Wigmore, *Evidence* § 884 as follows. When an out-of-court statement is received into evidence, the statement "stands testimonially as the equivalent of a statement made on the stand.... [T]he statement[ ] being testimonial in [its] nature, it is proper to subject [it], when admitted, to impeachment in the appropriate ways[.]" Because the trial court admitted Dorman's deposition as substantive evidence, the statement was subject to impeachment. Moreover, because a witness's deficiencies in perception and memory of the facts are a proper subject for impeachment, Fraidin was entitled to offer evidence tending to prove that Dorman was drunk at his deposition. *See generally,* 6 McLain, *Maryland Evidence* § 607.8. Here, however, the evidence Fraidin utilized to impeach the deposition testimony—Dorman's January 16th statement—was hearsay. It was an out-of-court statement offered to prove the truth of the matter asserted—that Dorman was drunk at his deposition. A statement "remains an 'out-of-court' statement for the purpose of the hearsay definition even if it was made in a court at some other time." 6 McLain, *Maryland Evidence* § 801.2; *Bright v. State,* 183 Md. 308, 319, 38 A.2d 96 (1944) (state-

ment made at preliminary hearing was hearsay). Fraidin argues the statement was admissible because it was a prior inconsistent statement, and the declaration of a party opponent. We disagree that the statement falls within either of these exceptions to the hearsay rule.

Appellants' assertion that Dorman's January 16th statement was a prior inconsistent statement, begs the question: inconsistent with what? Here, Fraidin did not call Dorman to the stand; instead, he attempted to introduce the statement himself. The text of Dorman's deposition contained in the record extract does not contain a statement by Dorman that he was sober. Dorman's statement that he was drunk at his deposition was not, therefore, inconsistent with any statement Dorman made in the deposition.

Impeachment by prior inconsistent statement is problematic for another reason. Before a witness may be impeached with a prior inconsistent statement, counsel must lay a proper foundation. "The foundation is laid by interrogating the witness [who made the statement] as to when, the place at which, and the person to whom such contradictory statements were made." *State v. Kidd,* 281 Md. 32, 46 n. 8, 375 A.2d 1105 (1977), *cert. denied,* 434 U.S. 1002, 98 S.Ct. 646, 54 L.Ed.2d 498 (1977). Because Dorman was never put on the witness stand, counsel could not have questioned Dorman about the circumstances under which the January 16th statement was made. Since no foundation for the statement was laid, it could not be introduced. Appellants' alternative was, of course, to call Dorman as a witness. For whatever reason, appellants made a tactical decision not to do so. Without putting Dorman on the stand, however, his January 16th statement was inadmissible. *Matthews v. Dare,* 20 Md. 248, 269 (1863).

Appellants' assertion that the statement was admissible because it was an admission of a party opponent fails as well. To qualify as an admission, the statement "must be offered against the party opponent." 2 Strong, *McCormick on Evidence* § 254, at 143; *Aetna Casualty & Surety v. Kuhl,* 296 Md. 446, 455, 463 A.2d 822 (1983). Since no

claims or cross claims were made between appellants and the Dormans, they were not opponents. The exception is inapplicable.

Having perceived its error in admitting Dorman's January 16th statement, the trial court properly withdrew the statement from evidence. Appellants' argument that "had the court ruled the statement inadmissible, the Defendants would have been on notice to offer other evidence to prove the same facts," is unpersuasive. Appellants had ample opportunity to present such evidence. Anyone who was present at Dorman's deposition could have testified as to whether they believed he was drunk. Appellants could have called Dorman to the stand, but chose not to do so. Moreover, when appellants did learn that Dorman's January 16th statement was being withdrawn from evidence, they did not ask the trial court for the opportunity to put on additional evidence. Having failed to ask for the opportunity to present additional evidence in light of the trial court's ruling, appellants may not complain about their inability to do so now.

### III. COMPENSATORY DAMAGES

#### A.

■ The jury awarded a total of $183,474.94 in compensatory damages on the count of tortious interference with contract: $91,737.47, plus interest, each to Braiterman, P.A. and Weitzman. This amount is precisely one-half the amount of the judgment in *Dorman v. Fraidin*. Appellants make two arguments with respect to the compensatory award: 1) the award should be limited to $25,000—one-half the amount the Dormans received to settle the claim; 2) because the Dormans are jointly and severally liable with appellants for damages caused by the Dormans' breach of contract, the compensatory award against appellants must be modified.

In *Rite Aid Corp. v. Lake Shore Investors*, 298 Md. 611, 471 A.2d 735 (1984), the Court of Appeals considered how

damages for interference with a contract are to be measured. The damages include "such damages as would reasonably flow from a tortious contractual interference," and may include pecuniary loss of the benefits of the contract, consequential losses, emotional distress, actual harm to reputation, and, in the appropriate circumstances, punitive damages. *Id.* at 621–22, 471 A.2d 735. Under the facts of this case, we hold that the compensatory damages are not limited to $25,000 (one-half the amount of the settlement).

This precise point was addressed in *State Farm Ins. Co. v. Gregory*, 184 F.2d 447, 448 (4th Cir.1950), and we find its reasoning persuasive:

> "It is argued that the recovery should have been limited by the percentage provided for in the contingent fee as applied to the amount of the compromise and not as applied to the face of the policy; but it is clear that the damages recoverable as the result of the wrongful interference with contract should not be limited to the proceeds of the settlement which resulted from the wrongful interference. The jury might well have concluded that, but for the interference, plaintiff would have recovered the full amount of the policy for his client and would have been entitled to the percentage thereof provided for in his contract for contingent fee. The settlement at less than the face of the policy was based upon the elimination of the plaintiff's fee by the wrongful interference with his contract; and damages for the wrongful interference with his contract; and damages for the wrong should embrace all elements reasonably flowing therefrom and not be limited by the amount of the settlement made in its perpetration. To permit this would be to permit the wrongdoer to profit to that extent from the wrong that he has perpetrated."

Financial statements introduced by Braiterman, P.A. and Weitzman showed appellants' net worth to be well in excess of that needed to satisfy the *Dorman v. Fraidin* judgment. The jury could have concluded from these statements that,

but for Fraidin's interference, Braiterman, P.A. and Weitzman would have recovered the full amount of their contingent fee.

### B.

■ Appellants argue the $183,474.94 compensatory award entered against them for tortious interference with contract should be reduced by $25,000 to account for the $25,000 compensatory award entered against the Dormans for breach of contract. Appellants' argument that Braiterman, P.A. and Weitzman are being compensated twice for the value of the contract has some merit, but a reduction in the judgment against appellants is not required at this time.

In *Lake Shore*, the Court of Appeals specifically adopted as the law of Maryland the provisions of § 774A of Restatement (Second) Torts. 298 Md. at 621, 471 A.2d 735. Section 774A(2) provides:

"In an action for interference with a contract by inducing or causing a third person to break the contract with the other, the fact that the third person is liable for the breach does not affect the amount of damages awardable against the actor; but any damages in fact paid by the third person will reduce the damages actually recoverable on the judgment."

The comment to this section explains:

"The fact that the plaintiff may have a cause of action against the person who has broken his contract does not prevent recovery against the defendant who has induced or otherwise caused the breach, *or reduce the damages recoverable against him.* The defendant and the contract breaker are both wrongdoers ... and each is liable for the entire loss that he has caused. Even a judgment obtained for breach of the contract if it is not satisfied does not bar or reduce recovery from the one who has caused the breach. But since the damages recoverable for breach of the contract are common to the actions against both, any payments made by the one who breaks the contract or partial satisfaction of the judgment

against him must be credited in favor of the defendant who has caused the breach."

(Emphasis added.)

Accordingly, appellants are not entitled to a reduction in the amount of the judgment against them for tortious interference with contact. Should the Dormans satisfy the judgment against them for breach of contract, or any part thereof, appellants would be entitled to a credit in that amount.

## IV. PUNITIVE DAMAGES

Appellants challenge the constitutionality of the jury's $3,000,000 punitive damage award ($2,500,000 in favor of Weitzman and $500,000 in favor of Braiterman, P.A.).

### A. *Sufficiency of the Evidence*

Appellants contend the evidence was insufficient to show they acted with "actual malice" in injuring Braiterman, P.A. and Weitzman. Actual malice refers to "conduct characterized by evil motive, intent to injure, ill will, or fraud." *Owens–Illinois, Inc. v. Zenobia,* 325 Md. 420, n. 20 at 460, 601 A.2d 633 (1992). *See also Schaefer v. Miller,* 322 Md. 297, 300, 587 A.2d 491 (1991) (Actual malice is "the performance of an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff.")

There was evidence before the jury from which it could conclude Fraidin "deliberately and wilfully" interfered with the contract between Braiterman, P.A. and Weitzman and the Dormans and that "the interference was purposely done in order to injure" Braiterman, P.A. and Weitzman. *Lake Shore Investors v. Rite Aid Corp.,* 55 Md.App. 171, 181, 461 A.2d 725 (1983), *aff'd,* 298 Md. 611, 471 A.2d 735 (1984). Fraidin stated, in an east Baltimore bar, that if Dorman settled with Fraidin, Dorman would not have to pay Weitzman, and that Fraidin would keep the amount of the settlement confidential. Fraidin made clear at the meeting that

occurred at McDonald's that Fraidin would not deal with the Dormans in Weitzman's presence. Fraidin dictated to the Dormans the letter firing their counsel, and had them reaffirm the discharge by initialing the firing letter at settlement. Weitzman testified Fraidin threatened to sue him. Fraidin explained to Weitzman his strategy was to sue the lawyers that sued him, because "if he gave lawyers who sued him enough trouble ... lawyers would stop bringing cases against him." Weitzman testified he had "a clear notion" it was Fraidin's intention to settle the Dormans' case without his being present at the settlement because Fraidin wanted to assure he did not get paid.

When the facts in the case *sub judice* are compared with facts that courts have found sufficient to constitute actual malice, it is clear to us that the evidence in the case *sub judice* was sufficient. For example, *Lake Shore* involved a dispute between a possible tenant, Rite Aid, and a limited partnership that was developing a shopping center, LSI. After negotiations with Rite Aid deteriorated, LSI entered into a lease with Drug Fair. The evidence showed that a representative of Rite Aid vowed "to fix" the partner at LSI who had attempted to negotiate the lease with Rite Aid. Another representative of Rite Aid threatened litigation unless LSI agreed to build a Rite Aid in the shopping center. Counsel for Rite Aid contacted counsel for Drug Fair and said in an "intimidating" voice that Drug Fair could either yield its lease or be in the same shopping center with Rite Aid. The court concluded these facts were sufficient to support an award of punitive damage.

In *McClung–Logan Equip. Co., Inc. v. Thomas*, 226 Md. 136, 172 A.2d 494 (1961), a seller of tractors wrongfully seized a tractor from a buyer who had lodged several complaints about the tractor's performance. In upholding an award of punitive damages, the court found ample evidence from which a jury could find, "that [the seller] acted wilfully, wantonly, and maliciously in utter disregard of [the buyer's] rights." 226 Md. at 149, 172 A.2d 494. The court explained "[i]t was a reasonable and proper inference

that" the seller became "provoked" with the buyer's numerous complaints about the tractor's performance and determined to stop the complaints by seizing the tractor and forcing the buyer to sign a release of the claims it might have against the seller. *Id.* The court further explained that the evidence was particularly clear in light of the seller's insistence that the buyer release all claims against the seller in order to redeem the tractor. *Id.*

In the case *sub judice,* there was evidence that Fraidin required the Dormans to discharge Braiterman, P.A. and Weitzman before he would settle the case. In fact, Fraidin was the author of the letter that discharged the Dormans' attorneys. Because Fraidin could have settled with the Dormans without forcing them to discharge their counsel, it is obvious that Fraidin intended to injure Braiterman, P.A. and Weitzman. The evidence was sufficient to show Fraidin's conduct was characterized by evil motive, intent to injure and ill will. *Zenobia, id., supra.*

Appellants also contend that even if they acted with actual malice, they were not *solely* motivated by a desire to harm Braiterman, P.A. and Weitzman, but rather by a desire to save money by settling with the Dormans. Appellants cite *Knickerbocker Ice Co. v. Gardiner Dairy Co.,* 107 Md. 556, 569–70, 69 A. 405 (1908):

> "[I]f, for example, there was evidence tending to show that the defendant had caused the contract to be broken *for the sole purpose,* and with the deliberate intention *of wrongfully injuring the plaintiff,* exemplary damages might be recovered, but when the object was merely to benefit itself, although the plaintiff would be thereby injured, there would be no more reason for allowing such damages than there would be in a suit by one party to a contract against the other for breach of it."

(Emphasis added.) We find no merit in appellants' contention that Fraidin was not motivated by a desire to harm Braiterman, P.A. and Weitzman. The argument that Fraidin settled with the Dormans to save money misses the point. Appellants fail to recognize that Fraidin was not sued

merely for settling with the Dormans, but for inducing the Dormans to breach their contract with Braiterman, P.A. and Weitzman by making it a condition of settlement that the attorneys not be paid. As we have pointed out, Fraidin could have settled the case with the Dormans without forcing them to discharge their attorneys. Instead, he required that the Dormans discharge their attorneys and facilitated the discharge by providing the text for the discharge letter. Fraidin made it clear that he would not settle with the Dormans unless they fired their attorneys when he required the Dormans to initial the firing letter at settlement.

### B. *Due Process*

In *Pacific Mutual Life Ins. Co. v. Haslip*, —— U.S. ——, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), the Supreme Court concluded it was possible for a punitive damage award to violate due process. It considered three aspects of the award in determining whether it passed constitutional muster: 1) standards to guide the jury's and the court's discretion; 2) judicial review of jury verdicts; and 3) the amount of the award. In *Alexander v. Evander*, 88 Md.App. 672, 596 A.2d 687 (1991), *cert. denied*, 326 Md. 435, 605 A.2d 137 (1992), Chief Judge Wilner, writing for this Court, analyzed Maryland law in light of the Supreme Court's opinion in *Haslip*. After outlining case law generated by the Court of Appeals on the issue of punitive damages, he enumerated standards for evaluating punitive damage awards in Maryland, based on that case law, that conform with the requirements implicit in *Haslip*. Those standards are as follows:

"[P]unitive damages:

(1) may be imposed only where there is "outrageous conduct," *Nast v. Lockett*, 312 Md. 343, 349, 539 A.2d 1113 (1988), quoting from Black's Law Dictionary 352 (5th ed. 1979);

(2) may be awarded only upon a showing of "actual malice" on the part of the defendant, i.e., "the performance of an act without legal justification or excuse, but

with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff" or, in certain kinds of cases, subject to further refinement by the Court of Appeals, "implied malice," i.e., "conduct of an extraordinary nature characterized by a wanton or reckless disregard for the rights of others," *Schaefer v. Miller*, 322 Md. 297, 300, 587 A.2d 491 (1991);

(3) "are to punish the wrongdoer, to teach him not to repeat his wrongful conduct and to deter others from engaging in the same conduct," *Wedeman v. City Chevrolet Co.*, 278 Md. 524, 531, 366 A.2d 7 (1976);

(4) "must relate to the degree of culpability exhibited by a particular defendant and that party's ability to pay," *Embrey v. Holly*, 293 Md. 128, 142, 442 A.2d 966 (1982);

(5) "represent a civil fine, and as such, should be imposed on an individual basis," *Id.;* and

(6) may be awarded only upon proof of actual loss and thus may *not* be awarded unless there is also an award of compensatory damages; *Shell Oil Co. v. Parker*, 265 Md. 631, 640, 291 A.2d 64 (1972); *Rite Aid Corp. v. Lake Shore Inv.*, 298 Md. 611, 626, 471 A.2d 735 (1984)."

*Alexander*, 88 Md.App. at 715–16, 596 A.2d 687 (footnote omitted). Judge Wilner concluded that "[t]aken together ... [the principles enunciated in the cases] suffice in our view to 'reasonably accommodate [the defendant's] interest in rational decision making and [the State's] interest in meaningful individualized assessment of appropriate deterrence and retribution.'" *Id.* at 716, 596 A.2d 687 (quoting *Haslip*, —— U.S. ——, 111 S.Ct. at 1044). In *Medical Mutual Liability Ins. Society of Maryland v. B. Dixon Evander & Assoc., Inc.*, 92 Md.App. 551, 609 A.2d 353 (1992), this court summarized the application of the due process standards set forth in both *Haslip* and *Alexander* as follows:

"that the jury should be carefully instructed as to these standards; that the trial judge should review the verdict, apply the same standards and assure that the size of the award will 'accomplish society's goals'; and that the

amount of the award should be reviewed for excessiveness."

(citations omitted).

 Appellants argue that the punitive damage award does not comport with due process because the trial court gave inadequate and inconsistent jury instructions on actual malice, which is the standard all parties agree applies to this case. On December 17, 1990, the court instructed the jury:

"In addition to damages compensating the plaintiffs for their actual damages, you may, but are not required to, award punitive damages. In this case you are being called upon to first declare whether or not you find that punitive damages should be awarded to the plaintiffs. If you so find, then you shall be given additional instructions.

In order to determine whether or not punitive damages should be awarded, you must find that the defendants had actual malice toward the plaintiffs as their sole motivation for their actions and that their acts were committed for the principle [sic] purpose and deliberate intention of wrongfully injuring the plaintiffs rather than protecting their own interest. The actual malice must be toward the plaintiffs, not against the Dormans, in order to award punitive damages to the plaintiffs.

\* \* \* \* \* \*

Actual malice exists if the conduct complained of was performed in such a manner and under such circumstances as to show that it was without legal justification or excuse and it also was influenced or motivated by hatred or spite or ill will and was performed for the sole purpose to intentionally and deliberately injure or cause damage or loss to the plaintiffs."

The jury sheet, which the jurors were permitted to take to the jury room asked:

"Should punitive damages be assessed against the Defendants Fraidin and North American Credit Corp. and Pacific Mortgage and Investment Group?"

Appellants contend the jury verdict sheet was inconsistent with the oral instruction because the jury sheet made no reference to the actual malice requirement. This "inconsistency," appellants argue, "rendered the jury incapable of properly assessing whether punitive damages could be awarded." There is no inconsistency. The verdict sheet need not repeat the oral instructions given to the jury. The jury heard the instructions, and presumably utilized them properly in determining that punitive damages should be assessed against appellants. Because there is no inconsistency, the authority cited by appellants, *Rosenkovitz v. United Ry. & Elec. Co.*, 108 Md. 306, 316–17, 70 A. 108 (1908), (oral instructions inconsistent with written instructions) is inapplicable.

 Appellants also contend that the instructions given during the punitive damage phase of the trial were inconsistent with the previous instructions and were erroneous. Appellants complain the instructions lacked any reference to the fact that punitive damages could not be assessed against appellants unless they acted with actual malice, and unless their sole motivation was to injure Braiterman, P.A. and Weitzman. Following the presentation of evidence in the punitive damages phase of the trial, the court gave the following instructions:

"Now, your previous verdict was an award to the plaintiffs to compensate them for the actual damages they sustained. You may also award them additional damages known as punitive damages. Punitive damages are awarded to punish a defendant who acted the way he did because of malice or intent to cause injury or damage or loss and also to deter others from acting in a similar fashion. Malice or intent with which you are to concern yourselves must be against the plaintiffs and not the malice or intent, if any, that focused on the Dormans.

Now, there is no exact rule by which to determine the amount of punitive damages. You may fix such amounts as in the exercise of your sound discretion you find will serve to punish the defendants and deter others from acting in similar ways. The financial conditions of the defendants may be considered in determining the amount of damages. Now, there need not be any ratio relationship between the amount of compensatory damages and the amount of punitive damages you assess, if any. In determining the amount of punitive damages you may consider the degree of malice shown by the evidence to have accompanied or motivated the Defendants' conduct."

Based on the instructions given in the previous phase of the trial, including instructions on malice and motivation, the jury determined that punitive damages should be assessed against appellants. Instructions on the malice and motivation necessary to support an award of punitive damages were pertinent only to the jury's decision of whether to award punitive damages. Because the jury already determined that punitive damages should be assessed against appellants, instructions on the malice and motivation necessary to support an award of punitive damages were irrelevant. The purpose of the punitive damages phase of the trial was to determine the *amount* of punitive damages. Whether such an award was warranted had already been determined by the jury. Appellants were not entitled to have the instructions on actual malice and motivation re-read to the jury.

 Appellants further complain that the post-trial procedures were insufficient because the trial court made no effort to determine whether the punitive damages award comported with due process. As explained in *Alexander,* "the circuit courts in Maryland have broad discretion to review jury verdicts for excessiveness." 88 Md.App. at 716, 596 A.2d 687. "A trial judge, upon finding a verdict excessive, may order a new trial unless the plaintiff will agree to accept a lesser sum fixed by the court." *Banegura v. Taylor,* 312 Md. 609, 624, 541 A.2d 969 (1988). In determin-

ing whether the award is excessive, the trial court essentially applies the same standards the jury did. *Alexander*, 88 Md.App. at 716, 596 A.2d 687. "This discretionary review, tempered by those standards, 'provides an additional check on the jury's ... discretion[.]'" *Id.* at 717, 596 A.2d 687 (quoting *Haslip*, —— U.S. at ——, 111 S.Ct. at 1045).

Appellants filed a post-trial Motion for Judgment Notwithstanding the Verdict or Revision of the Judgment or a New Trial ("post-trial motion"). The court interpreted this motion to include a motion for remittitur. After listening to extensive argument regarding the amount of the punitive damage award, the trial court denied appellants' motion. Appellants complain the trial court made no analysis *on the record* as to why the punitive damage award should stand.

Even in the wake of *Haslip*, there is no requirement in Maryland that a trial court state on the record its reasons for interfering or not interfering with a jury verdict. *Medical Mutual*, at 582, 609 A.2d 353. We have reasoned that

"[t]he federal rules of civil procedure contain no express requirement that a court specify the grounds upon which it is acting in granting or denying a motion for new trial or remittitur ... [t]hus, to require as a matter of constitutional law a procedure like Alabama's ... [in *Haslip*, requiring the trial court to state its reasoning on the record,] in *every case* would be contrary, not only to the practice consistently followed by a number of states (such as Maryland), but also to the well-established federal practice. Moreover, there would seem to be some instances in which it is clear from the record, without any express findings by the trial judge, that a punitive damage award is not excessive."

*Id.* at 583, 609 A.2d 353 (citations omitted) (emphasis added).

 We conclude in the case *sub judice*, that the trial judge undertook an appropriate review of the jury's award. It is clear from the court's comments at the hearing that the court's conclusion not to disturb the jury's verdict was based on its decision that the evidence supported the award. Although the trial court did not explicitly state it found

Fraidin acted with actual malice, this finding is implicit from the court's decision and discussions with counsel. We are not satisfied, however, that the trial court adequately considered whether the amount of the jury's award offended notions of due process. Evidence introduced regarding appellants' net worth did not support the amount of the jury's award. We explain.

In *Alexander,* we stated, among the principles articulated by the Court of Appeals in various cases, punitive damages "must relate to the degree of culpability exhibited by a particular defendant and *that party's ability to pay.*" 88 Md.App. at 716, 596 A.2d 687 (quoting *Embrey v. Holly,* 293 Md. 128, 142, 442 A.2d 966 (1982) (emphasis added)). Although eschewing any desire to "engage in a proportionality review of punitive damage awards," 88 Md.App. at 721, 596 A.2d 687, in deciding whether the award in *Alexander* comported with due process, we did compare it with other awards. We noted that the largest award, of which we are aware, rendered by a Maryland court was $7,500,000 in *Potomac Electric v. Smith,* 79 Md.App. 591, 558 A.2d 768 (1989) (Utility company permitted a high voltage wire to remain downed in an area frequented by children which subsequently caused the electrocution of a child.). The next highest award allowed to stand was $910,000 against Exxon Corporation in *Exxon Corp. v. Yarema,* 69 Md.App. 124, 516 A.2d 990 (1986) (Action against corporation whose storage tanks leaked gasoline that interfered with landowners' property rights.). We also commented that other than these awards, most have been well under $100,000. 88 Md.App. at 720, 596 A.2d 687.

What disturbs us about the award in the case *sub judice* is not the particular amount of the award, but its proportion to appellants' wealth. Evidence regarding appellants' net worth was controverted. Information prepared by Fraidin, for litigation purposes, placed his personal wealth at $250,-000, and the Corporations' in the red as of June 1990. Fraidin's sworn application to the Western Surety Company, introduced by Braiterman, P.A. and Weitzman, showed Fraidin's net worth (including corporate assets) to be over

$3,000,000, as of June 1985. Fraidin did not produce copies of his income tax returns for 1988, 1989, or 1990. The jury was entitled to reach its own conclusions regarding appellants' net worth; however, no estimates appear to be higher than in the area of $3,000,000. Thus, the $3,000,000 punitive award was essentially equivalent to the maximum approximation of appellants' net worth. When a punitive damage award consumes a defendant's total wealth, it has ceased to serve the societal goal of punishment. A defendant need not be financially destroyed in order to be punished.

In *Mattison v. Dallas Carrier Corp.*, 947 F.2d 95 (4th Cir.1991), Judge Neimeyer expressed his concern that a defendant's wealth should not only be a relevant factor in awarding punitive damages, but a limiting factor. In declaring South Carolina's procedure regarding punitive damage awards denied the defendant due process, Judge Neimeyer recognized that South Carolina did not have a requirement that:

"punitive damages bear any *specified* relationship to the wealth of the defendant. While the court decisions state that the financial ability of the defendant is a relevant factor for consideration by the jury, it is apparently not limiting, and there is no requirement that the defendant have a means to pay."

*Id.* at 100. (emphasis added). The court noted that since *Haslip* was decided, the Supreme Court of South Carolina has adopted new guidelines for the review of punitive awards. One such guideline was "defendant's ability to pay." *Id.* Applying the new guidelines, the court directed the trial court on remand to instruct the jury that:

"Any penalty must be limited to punishment and thus may not effect economic bankruptcy. To this end, the ability of the defendant to pay any punitive award entered should be considered."

*Id.* at 110.

Other courts have characterized the defendant's ability to pay as a limiting factor which must be considered by the

jury in the first instance, and the trial court upon its review of the jury's award. In *Smith v. Telophase Nat'l Cremation Soc'y, Inc.*, 471 So.2d 163 (Fla.Dist.Ct.App.1985), a jury awarded Smith $1,250,000 in punitive damages (in addition to compensatory damages) after Telophase failed to dispose of decedent's ashes in accordance with specific instructions. Finding the punitive damage award excessive, the trial court ordered a new trial in the event a remittitur was rejected. *Id.* at 164. The District Court of Appeal of Florida held that the trial court properly found the punitive damage award to be excessive:

> [T]he only evidence in the record as to the assets of [Telophase] show a net worth of approximately $1,000,-000.
>
> Accordingly, on the face of the record as we have it, punitive damages in an award of $1,250,000 would clearly bankrupt the corporation. It is error for a punitive damage award to be in an amount which will result in economic castigation or bankruptcy of a defendant.

*Id.* at 170.

In *Adams v. Murakami*, 54 Cal.3d 105, 284 Cal.Rptr. 318, 813 P.2d 1348 (1991), the Supreme Court of California addressed the excessiveness of a punitive damage award. Although the issue in *Adams* was whether evidence of the defendant's financial condition is a prerequisite to the award of punitive damages, and if so, who bears the burden of proof, the Court made, in passing, several notable comments. The Court recognized that a punitive damage award "can be so disproportionate to the defendant's ability to pay that the award is excessive *for that reason alone.*" *Id.* 284 Cal.Rptr. at 321, 813 P.2d at 1351 (emphasis in original). The Court reiterated its explanation in *Neal v. Farmers Ins. Exch.*, 21 Cal.3d 910, 148 Cal.Rptr. 389, 582 P.2d 980 (1978), that "the purpose of punitive damages is not served by financially destroying a defendant. The purpose is to deter, not to destroy." *Id.* 284 Cal.Rptr. at 322, 813 P.2d at 1352. The court acknowledged that " 'the absence of evidence of net worth precludes an appellate

court from deciding whether an award might, for example, bankrupt the defendant.' " *Id.* 284 Cal.Rptr. at 323, 813 P.2d at 1353 (*quoting Dumas v. Stocker,* 213 Cal.App.3d 1262, 1269, 262 Cal.Rptr. 311 (1989)); *see also MGW, Inc. v. Fredricks Dev. Corp.,* 5 Cal.App.4th 92, 111–12, 6 Cal. Rptr.2d 888 (1992) ("All that is necessary in cases where punitive damages are awarded is some evidence from which a reasonable jury and reviewing courts can conclude the award will deter but not cripple the defendant financially."); *Wollersheim v. Church of Scientology,* 4 Cal.App.4th 1074, 1095, 6 Cal.Rptr.2d 532 (1992) (reversing punitive damage award because it constituted 150 percent of defendant's net worth); *Gerard v. Ross,* 204 Cal.App.3d 968, 980, 251 Cal. Rptr. 604 (1988) ("[J]ury misunderstood the purpose of punitive damages and/or acted out of passion or prejudice" because it awarded a $100,000 punitive damage award against the defendant law firm which had a net worth of $100,000 and an annual net income between $90,000 and $150,000); *McDonough v. Jorda,* 214 N.J.Super. 338, 519 A.2d 874, 879 (App.Div.1986), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989) ("[A] jury must take into consideration the wealth of the defendants. This is so because the theory behind punitive damages is to punish for the past event and to prevent future offenses, and the degree of punishment resulting from a judgment must be, to some extent, in proportion to the means of the guilty person."); *Nelson v. Jacobsen,* 669 P.2d 1207, 1219 (Utah 1983) ("[T]he defendant's net worth and income are always relevant in determining the amount of punitive damages that would be appropriate for punishment."); *cf. Green Oil Co. v. Hornsby,* 539 So.2d 218, 222 (Ala.1989) (Financial position of defendant is not to be considered by the jury in awarding punitive damages but is "a consideration essential to a post-judgment critique of a punitive damages award."). *But see Hensley v. Paul Miller Ford, Inc.,* 508 S.W.2d 759, 764 (Ky.1974) ("[I]n actions for punitive damages the parties may not present evidence or in anywise advise the jury of the financial conditions of either side of the litigation.");

*Peisner v. Detroit Free Press,* 68 Mich.App. 360, 242 N.W.2d 775, 780 (1976) (holding that the financial status of the defendant is immaterial, because the purpose of punitive damages in Michigan is to fully compensate the plaintiff, not punish the defendant).

Appellants argued in their post-trial motion that the amount of the punitive damage award was excessive because it was "outrageous, and should shock the conscience of the court." In a supplemental statement of points and authorities, the corporate appellants asserted that the "pecuniary circumstances of the Defendant are to be considered" and in this case, the jury "acted arbitrarily and granted punitive damages which will consume the Defendants' net worth." At the post-trial motion hearing, the following colloquy ensued:

Mr. Steele: That award is way out of kilter with the conduct to be deterred and the actual amount of compensatory damages awarded on that. I would also say that when you add in the evidence on net worth Mr. Hettleman has advised me that the net worth of Mr. Hettleman and the two corporations—

The Court: You mean Mr. Fraidin.

Mr. Steele: Sorry. I mean Mr. Fraidin and the two corporations.

The Court: I don't know Mr. Hettleman's net worth.

Mr. Steele: I didn't ask him that, your honor. I shouldn't have said that. He indicated to me that he thought the evidence before the jury was something in the area of 3 to 3.3 million dollars insofar as the two corporations and Mr. Fraidin is concerned.

I would submit that based on the conduct to be deterred, that is the interference with the fee agreement and the conduct that relates to that issue and to the net worth of the individual and the two corporate entities, that it is an excessive award because it in effect is the whole shooting match.

The Court: I tried a case involving one of the major asbestos insulation companies and as to one plaintiff the

jury verdict was one million dollars compensatory and—I am trying to remember the rest of it—and 74 million dollars punitive.

Now, does that make it out of line just on those figures?

Mr. Steele: Well, we don't know what the net worth of the asbestos company was, your honor.

The Court: Suppose the jury heard evidence that the net worth of the asbestos company was around 75 million dollars.

Mr. Steele: I think it would be excessive and I think the courts would find that.

The Court: Okay.

Notwithstanding the foregoing arguments, the trial court denied appellants' post-trial motion.

Therefore, in accord with this court's decisions in *Medical Mutual* and *Alexander,* and the guidance provided by the Florida and California courts, we hold that although punitive damages are appropriate in the case *sub judice,* the jury did not properly consider appellants' wealth in making its punitive damage award. Upon its review of the amount of the award, the trial court did not "assure that the size of the award [would] 'accomplish society's goals,'" *Medical Mutual,* at 577, 609 A.2d 353, and disregarded the disastrous consequences the award would have on appellants' future existence. Had the trial court considered appellants' net worth, it would have required a remittitur, or ordered a new trial on the amount of punitive damages. Consequently, the punitive damage award does not comport with due process because the award "fails to serve its proper purpose" and exceeds "an amount that will accomplish society's goals of punishment and deterrence." *Alexander,* 88 Md.App. at 717, 596 A.2d 687, quoting in part from *Haslip,* —— U.S. at ——, 111 S.Ct. at 1045.

Under these circumstances, we are faced with three possible courses of action:

"(1) assume an authority implicit from *Haslip* to modify the award ourselves and reduce it to what we regard as

the proper amount, either directly or by ordering a new trial as to punitive damages in lieu of a remission by ... [Braiterman, P.A. and Weitzman]

(2) vacate the award and remand it for reconsideration by the trial judge in the exercise of his authority to require a further remittitur; or

(3) vacate the award and direct a new trial on that issue."

*Alexander*, 88 Md.App. at 721, 596 A.2d 687. We will not choose the first option absent clear direction from the Court of Appeals if other options exist. *Id.* at 722, 596 A.2d 687. Because the trial court did not consider appellants' net worth during its review of the jury's punitive damage award, we shall vacate the award and remand the case to the trial court for its reconsideration of granting a remittitur, or if rejected, a new trial.

▪ Appellants did not raise as an issue the adequacy of the jury instructions regarding the consideration of appellants' wealth. In order to guide the trial court in the event it orders a new trial, we shall briefly address what must be included in the trial court's jury instructions in light of our holding. *See* Rule 8–131(a).

When it came time to instruct the jury as to how they were to arrive at an amount of punitive damages, the trial court explained:

Now there is no exact rule by which to determine the amount of punitive damages. You may fix such amounts as in the exercise of your sound discretion you find will serve to punish the defendants and deter others from acting in similar ways. The financial conditions of the defendants may be considered in determining the amount of damages. Now, there need not be any ratio relationship between the amount of compensatory damages and the amount of punitive damages you assess, if any. In determining the amount of punitive damages you may consider the degree of malice shown by the evidence to have accompanied or motivated the defendants' conduct.

Should a new trial be necessary, the trial court, in addition to the foregoing instructions and any other instructions heretofore required on this issue, shall, at the request of the defendants, include an instruction by which the jury is advised that the amount of the punitive damage award should represent an appropriate punishment to appellants taking into account, as a limiting factor, evidence of their financial status. To this end, the jury may only *punish* appellants for their conduct, *not destroy or bankrupt them.* Of course, a defendant requesting this instruction may not object to the introduction of evidence of net worth.

C. *Admission of Evidence from Dorman v. Fraidin*

Because we have held *supra* that the "erroneously admitted evidence" was not erroneously admitted, we will not address this issue.

### V. PREJUDGMENT INTEREST

Appellants contend that the trial court erred in awarding Braiterman, P.A. and Weitzman prejudgment interest on the compensatory award entered against appellants for tortious interference with contract because: 1) there was no sum certain on which prejudgment interest could be calculated; 2) the jury's addition of the words "plus interest" after the amount of the compensatory award was insufficient to satisfy the requirement in Md. Rule 2–604(a) that an award of prejudgment interest be "separately stated in the verdict"; 3) the award was calculated incorrectly at the rate of ten percent. We agree with appellants that the award of prejudgment interest fails to satisfy the requirements of Rule 2–604(a).

"Under Maryland law the general rule is that prejudgment interest should be left to the discretion of the jury, or the trial court when sitting without a jury." *Merrick v. Mercantile–Safe Deposit & Trust Co.*, 855 F.2d 1095, 1106 (4th Cir.1988) (citing *I.W. Berman Properties v. Porter Brothers, Inc.*, 276 Md. 1, 18–19, 344 A.2d 65 (1975)). Rule 2–604(a) provides:

"Any pre-judgment interest award by a jury or by a court sitting without a jury shall be separately stated in the verdict or decision and included in the judgment."

Here, the jury was not instructed that it could award prejudgment interest. When the jury returned its verdict, however, it indicated Braiterman, P.A. and Weitzman were each to receive "$91,737.47 plus interest." During the hearing at which judgment was entered, counsel for appellants argued:

"[I]f there is going to be prejudgment interest, it has to be asked for and it has to be separately stated. It was not separately stated, nor was it separately asked for."

Rule 2–604(a) requires that an award of prejudgment interest be "separately stated in the verdict." We are convinced that, unless a jury is instructed on prejudgment interest, the mere addition of the words "plus interest" after the amount of the compensatory award is insufficient to satisfy the requirement. In *Eden v. Amoco Oil, Co., Inc.*, 741 F.Supp. 1192 (D.Md.1990) Judge Neimeyer explained:

"Prejudgment interest is an aspect of damage which is awarded to compensate a plaintiff for the loss of use of money. As the Supreme Court observed in *West Virginia v. United States*, 479 U.S. 305, 310–11 n. 2, 107 S.Ct. 702, 710 n. 2, 93 L.Ed.2d 639 (1987), '[p]rejudgment interest serves to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress.'

Because prejudgment interest is an element of the plaintiff's damages, the decision to include it as part of an award properly lies with the finder of fact.

\* \* \* \* \* \*

The notion that prejudgment interest is discretionary with the fact finder, however, does not authorize a court, once a jury has determined damages, to add to those damages a sum for prejudgment interest. The allowance

of prejudgment interest would have been discretionary with the jury had it been presented to the jury for consideration and had Eden requested the Court so to instruct the jury. No such claim was presented to the jury and no such request for instruction was made by Eden. It is not within the province of the Court to add to the verdict that which was within the province of the jury."

741 F.Supp. at 1196–97. (Emphasis added.) Whether to allow prejudgment interest was not presented to the jury *sub judice.* No instruction was requested. The jury's gratuitous addition of the words "plus interest" is insufficient to satisfy the requirement in Rule 2–604(a) that an award of prejudgment interest be "separately stated in the verdict." Without some instruction on prejudgment interest, we cannot be certain that the jury intended to award prejudgment interest when it said "plus interest." Absent a clear and separate statement from the jury that the compensatory award should include prejudgment interest, the trial judged erred in awarding it.

## V. MISTRIAL—RECUSAL

### A. *Motion for Mistrial*

During the proceedings on December 7, 1990, Fraidin made a motion that the court sanction Patrick O'Doherty, counsel for Braiterman, P.A. and Weitzman, for his conduct at the close of proceedings the previous day. Fraidin contended that O'Doherty made "vile threats" against Mrs. Dorman, and intimidated her by "flashing" a letter from the House of Ruth, a shelter for abused spouses, in front of her. Fraidin complained that O'Doherty should not have been speaking to Mrs. Dorman, especially since she was testifying, and requested the court impose sanctions against O'Doherty for threatening and intimidating Mrs. Dorman. O'Doherty explained that on the previous day Fraidin and counsel for Weinstock asked him how long he intended to have Mrs. Dorman on cross-examination, and he responded she might have to be there all day.

This answer upset Mrs. Dorman because she wanted to be at her job—a job providing care to the elderly. Mrs. Dorman said that if O'Doherty's mother were in need of care, he would not require her appearance in court, and O'Doherty replied that his mother was dead. With regard to the letter from the House of Ruth, O'Doherty explained he had arranged to have documents regarding Mrs. Dorman's stay there sent to the court to determine whether they were admissible. At this point, the court had Mrs. Dorman brought into the courtroom. Mrs. Dorman stated that O'Doherty never said anything to her personally, and had only addressed her in response to a comment that she had made. Shortly thereafter the court expressed its displeasure with Fraidin:

> "Mr. Fraidin, I want your attention. You had the gall to ask me to impose sanctions against Mr. O'Doherty, and after listening to Mrs. Dorman's comment about what transpired, I am seriously considering imposing sanctions against you for your twisted, loose, distorted use of these facts. And its not the first time this has happened.... We wasted over 20 minutes with your foolishness. I am not sure whether I am going to lock you up or impose a fine.... [W]hat you did this morning was completely uncalled for. It had no basis whatsoever, and the person that you contend was the b[r]unt of what supposedly Mr. O'Doherty did, came in and said nothing whatsoever occurred in light of the way you couched the facts.... [I]t was crystal clear what in fact did happen, and it is just not the first time you have done that, and I have suggested several times that you stop it, and I am very, very concerned, and I don't know what I might do. You may wind up over city jail for the weekend."

When proceedings concluded for the day, and the jury was removed from the courtroom the following transpired:

> "The Court: Mr. Fraidin, this morning I can't interpret that as anything other than a deliberate distortion of facts.... And I have asked you at least three or four other times to please be careful as to how you use the

facts, because you have been loose at times with them and I have been trying to give you the benefit of the doubt to try to think that it was not intentional, but what you did this morning ... [was] foolishness and nonsense ... and I can't see it as anything but an absolute deliberate distortion. And you have demonstrated that you have an uncanny gift with words, and an ability to speak and deliver as well as any attorney I have ever seen. [Counsel for Weinstock] ... has even adopted one of your arguments because it was so eloquent, and to even try to suggest that [what you did] was not intentional seems to be absolutely ludicrous."

Fraidin attempted to explain that he had not heard the entire exchange between Mr. O'Doherty and Mrs. Dorman but that he was certain an argument was taking place and that Mr. O'Doherty should not have been talking to Mrs. Dorman, in any event. He then continued by telling the court that he had never been arrested and that he had "a perfect record." The court reminded Fraidin that he had been convicted of a felony in Howard County. Fraidin attempted to equivocate about the felony conviction. Finally he expressed his respect for judges and his fear of the judicial system and that he would not intentionally violate a rule. At this juncture, at the court's direction, Fraidin was taken into custody by the sheriff. The court instructed that the jury be held for ten minutes so that Fraidin could be escorted from the building unseen. Fraidin was released from custody approximately forty-five minutes later. The docket entry indicates Fraidin was cited with contempt but found not guilty.

When trial recommenced, Fraidin declared that, as a result of his "agony and trauma" at having been jailed, and his "fear" of being "deprived of [his] liberty," he was unable to continue presenting his case. He requested a mistrial. Although the court made clear that nothing was prohibiting Fraidin from putting on his case, Fraidin "elect[ed] not to go forward," and requested that the court declare a mistrial. The court denied the motion.

██ Whether the trial court should declare a mistrial is a matter within its sound discretion, and its decision will not be disturbed unless there is a clear showing of abuse. *Jacobson v. Julian,* 246 Md. 549, 561, 229 A.2d 108 (1967); *Kelch v. Mass Transit Admin.,* 42 Md.App. 291, 297, 400 A.2d 440, *aff'd,* 287 Md. 223, 411 A.2d 449 (1979). There is no abuse of discretion here. Fraidin was, to say the least, an exasperating litigant. It is clear from the record that the trial court was not clearly erroneous in concluding that Fraidin deliberately misled the court about the basis for his motion for sanctions against O'Doherty. Given Fraidin's conduct, the trial court was empowered to cite Fraidin for contempt and place him in the custody of the sheriff. Md.Rule P3.

Fraidin was not prejudiced by his brief stay in jail. Fraidin's assertion that he was too "traumatized" to present his case was but a loose allegation designed to engineer a mistrial. Fraidin was so "traumatized" that he eloquently proffered what his witnesses would have said had he called them, inquired of the court as to the procedures for determining the jury instructions, participated in crafting jury instructions, argued his motion for judgment, noted his exceptions to the instructions, and presented a lengthy closing argument to the jury. Clearly Fraidin's decision to rest his case was the result of reasoned trial strategy, not any "trauma" he suffered at having been jailed. It is clear that the jury was unaware of Fraidin's brief incarceration. The jury was held in the jury room for about ten minutes, until after Fraidin had been escorted from the building. After a final verdict was rendered in the ensuing punitive damage trial, the trial judge went into the jury room and inquired whether any of the jurors knew that Fraidin had been taken into custody. They all replied they were unaware of the incident. Although the better practice would have been for the trial judge to have made this inquiry in the presence of counsel, the exchange between the judge and the jurors only confirms the fact that Fraidin

suffered no prejudice with the jury as a result of his incarceration.

### B. *Motion for Recusal*

 Prior to the beginning of the second trial, Fraidin filed a *pro se* motion asking Judge Noel to recuse himself. The motion, which rambles, essentially asserts that as a result of problems in the first trial, which ended in a mistrial, Judge Noel was biased against Fraidin. Fraidin's motion was denied, as was his motion to reconsider the denial. At a post-trial motions hearing, counsel for appellants renewed the motion for recusal "on the basis of the court's going in and asking the jury as to whether or not they saw Mr. Fraidin [in police custody.]" This had occurred after the jury had returned the verdict and had been discharged. The renewed motion for recusal was denied.

In their brief, appellants argue "the court punished and intimidated Fraidin in an unlawful and unconstitutional manner, abused its powers, and caused Fraidin to be unable to put on his case." Appellants contend these events establish that the court was motivated by personal animosity against Fraidin and that the trial judge should have requested another judge hear the recusal motions or should have recused himself.

Appellants refer us to Canon 3 C(1) of the Maryland Code of Judicial Conduct, which provides in pertinent part:

"A judge should not participate in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:

(a) the judge has a personal bias or prejudice concerning a party...."

"[T]he question of recusal, at least in Maryland, ordinarily is decided, in the first instance, by the judge whose recusal is sought[.]" *Surratt v. Prince George's County,* 320 Md. 439, 464, 578 A.2d 745 (1990). "When bias, prejudice or lack of impartiality is alleged, the decision is a discretionary one ... It will be overturned only upon a showing of abuse of discretion." *Id.* at 465, 578 A.2d 745. "The standard to be

applied is an objective one—'Whether a reasonable member of the public knowing all the circumstances would be led to the conclusion that the judge's impartiality might reasonably be questioned.'" *Id.* (quoting *Turney,* 311 Md. 246, 253, 533 A.2d 916 (1987)). A motion for recusal "must set forth facts in reasonable detail ... mere conclusions as to impartiality will not suffice." *Id.* at 467, 578 A.2d 745.

Fraidin's initial motion requested that Judge Noel recuse himself, or allow an "independent tribunal" to decide the motion. While it is true that a trial judge must permit another judge to decide the motion for recusal when the asserted basis for recusal is personal conduct of the trial judge, that is not the case here. *Surratt,* 320 Md. at 466, 578 A.2d 745. In *Surratt,* there was a claim of sexual harassment by a female lawyer against a male judge. Because Fraidin does not allege personal misconduct by the trial judge, it was permissible for the trial judge to rule on the recusal motion.

■ Appellants' claim, that the trial judge's impartiality was in question because of "the problems of the previous trial," is not sustainable. The Court of Appeals has made clear that a judge is not disqualified because he or she has acquired information about the parties during a prior judicial proceeding. *Boyd v. State,* 321 Md. 69, 76, 581 A.2d 1 (1990). Moreover, we discern nothing from the record that would rebut the presumption that Judge Noel was neither biased nor prejudiced against Fraidin. *Id.* at 80–81, 581 A.2d 1. Throughout the proceedings Judge Noel exhibited remarkable restraint and extreme tolerance of Fraidin. The court answered Fraidin's barrage of questions politely, listened thoughtfully to his objections, and, although not required to do so, occasionally explained legal points that Fraidin, as a *pro se* litigant, did not understand. In short, Judge Noel provided Fraidin with every opportunity to conduct his defense. There is nothing in the record to indicate that Judge Noel did not afford Fraidin this same level of courtesy and attention even after he was jailed. We do not interpret Judge Noel's decision to cite Fraidin

with contempt as a demonstration of any personal animosity against Fraidin, rather, we view it as legitimate exercise of the court's power and responsibility to control the conduct of the trial.

## APPEAL OF BRAITERMAN, P.A. AND WEITZMAN

Braiterman, P.A. and Weitzman ("Braiterman–Weitzman") appeal from the judgment entered in favor of Coppel and Gordon, Feinblatt, and Weinstock and Stevan & Harris (collectively "lawyer defendants"). Braiterman–Weitzman present two issues. The first involves Fraidin's assertion of attorney-client privilege with respect to his communications with Coppel and Weinstock. The second pertains to the jury instructions regarding the qualified privilege an attorney possesses while representing a client.

## VII. ATTORNEY–CLIENT PRIVILEGE

### A. *Coppel*

During discovery and at trial, Fraidin asserted attorney-client privilege to protect the revelation of communications between himself and Coppel. The general principle of attorney-client privilege has been stated as follows:

"(1) Where legal advice of any kind is sought (2) from a professional legal advisor in his [or her] capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his insistence permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived."

8 Wigmore, *Evidence* § 2292, at 554 (quoted in *Harrison v. State*, 276 Md. 122, 135, 345 A.2d 830 (1975). *See also* Md.Cts. & Jud.Proc.Code Ann. § 9–108 (1989) ("A person may not be compelled to testify in violation of the attorney-client privilege."). As a result of Fraidin's assertion of the privilege, Braiterman–Weitzman contend they were prevented from discovering admissible evidence bearing on Coppel's liability. They argue Fraidin waived attorney-client privilege with Coppel for three reasons: 1) Fraidin asserted

the defense of advice of counsel; 2) Fraidin partially disclosed privileged communications; and 3) advice of counsel was used to perpetrate a tort. We hold that Fraidin did not waive his right to assert attorney-client privilege. We address each of Braiterman–Weitzman's arguments.

### 1. Advice of Counsel

Braiterman–Weitzman argue that, when "a party pleads in defense that his conduct was based on the advice of counsel, the attorney-client privilege is automatically waived for *all* communications to and from counsel concerning the transactions for which the client sought counsel's advice." Braiterman–Weitzman conclude that Fraidin's defense was advice of counsel based upon Fraidin's opening statement and testimony. In his opening, Fraidin stated that he asked attorneys at the law firms of Stevan & Harris, and Gordon, Feinblatt whether it was legal for him to settle with the Dormans, and that attorneys from both firms replied it was legal, although counsel at Gordon, Feinblatt advised against it. On direct examination, Fraidin testified that he was relying on the advice of his lawyers during settlement with the Dormans. Because Fraidin's defense was advice of counsel, Braiterman–Weitzman contend that they should have been permitted further inquiry into the particulars of the communications between Fraidin and Coppel. Braiterman–Weitzman have mischaracterized Fraidin's defense.

As we recognized in *Manown v. Adams*, 89 Md.App. 503, 514, 598 A.2d 821 (1991), *cert. granted*, 325 Md. 739, 602 A.2d 1219 (1992), the defense of advice of counsel is, in essence, a defense whereby a party "attempt[s] to establish his own blamelessness by casting the blame for his conduct on his ... attorney." It does not involve denial of wrongdoing, but rather, attempts to "negate wrongdoing" where it was based on the advice of counsel. *Id.* Fraidin never admitted to any wrongdoing. Rather, he argued his attorneys had advised him it was legally permissible for him to settle with the Dormans. Although Fraidin did state that

he relied upon counsel's advice as Braiterman–Weitzman themselves recognized in their response to Fraidin's appeal, Fraidin's liability was not premised on his settlement with the Dormans. It is uncontroverted that it was legal for Fraidin to settle with the Dormans. *Sharrow v. State Farm Mutual*, 306 Md. 754, 766, 511 A.2d 492 (1986). Instead, Fraidin's liability was premised upon his alleged conduct in inducing the Dormans to discharge their counsel by making counsel's discharge a condition of settlement— an action which he denied. At no point did Fraidin defend himself by claiming his counsel advised him that he could do this. Had Fraidin's defense been advice of counsel, full disclosure would have been required, *Manown*, 89 Md.App. at 514–15, 598 A.2d 821, since it was not, disclosure was not required.

### 2. Partial Disclosure

The attorney-client privilege is subject to waiver, both express and implied. *State v. Pratt*, 284 Md. 516, 521, 398 A.2d 421 (1979). Wigmore explains implied waiver:

> "There is always also the objective consideration that when his [the client's] conduct touches a certain point of disclosure, fairness requires that his privileges shall cease whether he intended that result or not. He cannot be allowed, after disclosing as much as he pleases, to withhold the remainder."

8 Wigmore, *Evidence* § 2327, at 636. *See also Shawmut Mining Co. v. Padgett*, 132 Md. 397, 404, 104 A. 40 (1918). Prior to trial, Coppel and other attorneys sought, and were granted, a protective order that provided, *inter alia*, that they could testify "concerning communications between [themselves and Fraidin] ... to the extent necessary to defend the claims made against them and their law firms." Braiterman–Weitzman argue the trial court "construed this order as allowing selective disclosure and precluding follow-up inquiry." In particular, Braiterman–Weitzman assert that Coppel was permitted to testify, in his defense, that Fraidin asked him whether it was permissible for him to

settle with the Dormans and that he replied it was legal, but that he would not recommend it. Fraidin successfully invoked the privilege, however, to prevent Coppel from testifying about what Fraidin told Coppel regarding: 1) the December 3, 1985 meeting with the Dormans; 2) Fraidin's financial condition; and 3) the December 4, 1985 firing letter. Based upon our review of the record, we conclude there was no implied waiver of the attorney-client privilege, and that any partial disclosure was permissible under the self-defense exception granted to Coppel.

 Under the self-defense exception, counsel is permitted to reveal client confidence to the extent necessary to defend counsel from charges of wrongdoing. *See, e.g., Meyerhofer v. Empire Fire & Marine Ins. Co.,* 497 F.2d 1190, 1195 (2d Cir.1974), *cert. denied,* 419 U.S. 998, 95 S.Ct. 314, 42 L.Ed.2d 272 (1974). The exception must be construed narrowly, however, and should be limited strictly to information necessary to the attorney's defense. *See* Cunningham, *Eliminating "Backdoor" Access to Client Confidences: Restricting the Self–Defense Exception to the Attorney–Client Privilege,* 65 N.Y.U.L.Rev. 992 (1990). Otherwise, an opportunity for abuse would be created by individuals who, in order to obtain privileged information, sue a defendant's attorney.

Fraidin was aware that the privilege could be waived unintentionally, and he vigilantly guarded against such a waiver during his own testimony and Coppel's. The following excerpts are typical:

Q. [to Fraidin] What facts did you bring to them [Gordon, Feinblatt]?

Fraidin: Will answering that violate my—

Court: Do you wish to raise the privilege?

Fraidin: I raise the privilege

\* \* \*

Q. [to Fraidin] [D]id Mr. Coppel ever call you about your conduct in meeting with Mr. Dorman?

Fraidin: Check under the attorney-client privilege.

Court: You may answer that with a yes or no.

\* \* \*

Q. [to Coppel] So what did he [Fraidin] tell you, that he had gotten a firing letter [the December 4th letter]?
Fraidin: Objection.
Court: Objection is sustained.
Q. What did he tell you?
Court: Sustained.

Just prior to Coppel's testimony, this colloquy occurred:
Court: This is the part of the trial where we are going to have to have a lot of interplay between Mr. Graham [Coppel's attorney] and Mr. Fraidin. Because I am going to abide by Judge Davis's ruling [the protective order]. So there may be bench conferences that may create appearances for the jury and I will have to deal with it.
[Counsel for Weinstock]: Will he [Fraidin] have to individually object to each question?
Court: I don't want to try to predict, because I don't know.
Fraidin: Will I be permitted to make a continuing objection?
Court: I don't want a continuing objection, because it will be too broad, because often we are going to be talking about the question, not the privilege.
Fraidin: Would it be presumptuous for me to request the court to advise—
Court: Nothing is presumptuous.
Fraidin: to advise Mr. O'Doherty that I am aware of the privilege and not to try to trick—
Court: Mr. O'Doherty will not try to trick anybody.
[Counsel for Coppel]: Mr. Fraidin obviously wants to invoke his privilege and I—
Court: What do I have to do to tell all of you that the privilege has not been waived[?] Stand on my head?

Throughout Coppel's testimony Fraidin persistently objected to any questions that would require Coppel to reveal information he acquired from Fraidin. In short, we are

aware of only one instance in which Coppel was permitted to testify as to his communications with Fraidin—Fraidin's question to Coppel regarding the legality of his settlement with the Dormans. Coppel's counsel requested he be allowed to answer this question because the answer was essential to Coppel's defense. We agree. It was proper for Coppel to have been permitted to testify without waiving Fraidin's privilege.

### 3. Advice used in Perpetration of a Tort

Braiterman–Weitzman argue that because they "made the requisite showing that the advice of counsel was used in furtherance of a malicious tort," the exception to the privilege for fraud was triggered. As the Supreme Court recognized in *United States v. Zolin*, 491 U.S. 554, 563, 109 S.Ct. 2619, 2626, 105 L.Ed.2d 469 (1989), the privilege ceases when communications with an attorney are made "for the purpose of getting advice for the commission of fraud or a crime." *See also, Dixon v. Bennett*, 72 Md.App. 620, 531 A.2d 1318 (1987) (applying fraud exception to accountant-client relationship). The exception is clearly inapplicable, because it requires that advice be obtained for the purpose of perpetrating a fraud, not some other tort.

### B. *Weinstock*

Fraidin affirmatively waived his privilege with regard to communications made to Weinstock. Consequently, Braiterman–Weitzman were able to explore communications between Fraidin and Weinstock freely at trial. Thus, to the extent, if any, that Braiterman–Weitzman include in their argument regarding attorney-client privilege any assertion that Weinstock's culpability was insulated from them as a result of Fraidin's assertion of attorney-client privilege, they are mistaken.

### VIII. JURY INSTRUCTIONS ON QUALIFIED PRIVILEGE

Braiterman–Weitzman contend that the jury instructions regarding the qualified privilege an attorney possesses

while representing a client were erroneous and may have mislead the jury in its decision to exonerate the lawyer defendants.

The trial court gave the following instruction concerning the liability of the lawyer defendants:

"Four of the defendants in this case are lawyers or law firms, and a lawyer has an obligation to zealously represent his client within the bounds of the law.

In this case the plaintiffs have alleged a conspiracy between the defendant lawyers and their clients, and that is the defendant Jacob Fraidin and his corporations, to interfere with the plaintiffs' contingency fee agreement with Mr. and Mrs. Dorman.

You are instructed that in an attorney client relationship the client is the principal and the lawyer is the client's agent. As a matter of law, there can be no conspiracy between a principal and agent where the agent acts solely within the scope of the agent's employment. In other words, there can be no conspiracy between a lawyer and his client where the lawyer's advice or advocacy was within the scope of his job as the client's attorney and where the lawyer's advice or advocacy was for the benefit of his client rather than solely for the lawyer's personal purposes.

This is what is known as the qualified privilege an attorney has while representing a client. Under that privilege tortious interference with contracts does not occur when a defendant attorney simply gives advice to his client in response to the client's request or acts on the client's behalf.

If you find that any defendant attorney merely gave advice or acted on behalf of a client as distinguished from actively participating in the interference, then to overcome the privilege, that is the qualified privilege an attorney has in representing a client, the plaintiff must prove by a preponderance of the evidence that the defendant lawyers acted in advising their client with actual malice.

Actual malice means a desire to harm the plaintiffs which is independent of and unrelated to the lawyer's desire to protect his client. As such, an attorney cannot be held vicariously liable and is not responsible for the actions of his client if those actions go beyond the mere following of the legal advice given.

Accordingly, if you find that the defendant attorney simply rendered legal advice to his client within the scope of his representation of the client, and the legal advice is for the client's benefit and not solely for the lawyer's benefit, then your verdict concerning conspiracy to intentionally interfere with the contract must be for the defendant lawyers or law firms.

However, an attorney who has actual knowledge that his client is engaged in unlawful activity may not aid, assist or encourage the carrying on of that unlawful activity."

(Emphasis added.)

### 1. The Law

Initially, we observe that Braiterman–Weitzman concede the existence of the qualified privilege, and have premised their appellate argument on narrow grounds. They essentially argue two points with regard to the instructions. First, they argue "the jury should have been given the opportunity to differentiate between mere[ly giving] advice and actively counseling in the commission of a tort[.]" They complain that "[t]he trial court chose to lump together mere advice with actively guiding the commission of a tort, [thereby] giving Coppel and Weinstock the same protection of the qualified privilege for either set of facts[,] provided they acted in their 'capacity' as counsel." Second, appellants contend the instruction was improper because it required the jury to exonerate the lawyer defendants unless it found they acted for their own benefit, as opposed to Fraidin's.

Only appellants' second argument was preserved for our consideration. We have reviewed the objections to the

instructions made at trial. Counsel for Braiterman–Weitzman made only the following objection with regard to the foregoing instruction:

> "And with regard to the conspiracy count[,] I respectfully except to the court's instruction that deals with the legal requirement that you have to show that the lawyers acted solely for their own benefit, and for reasons simply state that I don't believe that is the law."

Although Braiterman–Weitzman did submit a proposed jury instruction, No. 25C, that supports their first argument, appellants did not object to the court's failure to give 25C. To the extent that Braiterman–Weitzman's arguments before this Court are broader than those presented to the trial court, we need not consider them. Md.Rule 2–520(e). *Jones v. Federal Paper Bd. Co.*, 252 Md. 475, 490–91, 250 A.2d 653 (1969).

We shall address Braiterman–Weitzman's contention that the instruction was erroneous because it required a showing that the lawyer defendants acted solely for their own benefit in order to impose liability on them. The pertinent part of the instruction provided:

> "there can be no conspiracy between a lawyer and his client where the lawyer's advice or advocacy was within the scope of his job as the client's attorney and where the lawyer's advice or advocacy was for the benefit of his client rather than solely for the lawyer's personal purposes."

> \* \* \* \* \* \*

> Accordingly, if you find that the defendant attorney simply rendered legal advice to his client within the scope of his representation of the client, and the legal advice is for the client's benefit and not solely for the lawyer's benefit, then your verdict concerning conspiracy to intentionally interfere with the contract must be for the defendant lawyers or law firms."

The instruction is a proper statement of law. First, there can be no conspiracy when an attorney acts

within the scope of his employment. It is established law that there can be no conspiracy between a principal and an agent where the agent acts within the scope of his or her employment. *See Harnish v. Herald–Mail Co.*, 264 Md. 326, 337, 286 A.2d 146 (1972) ("It is doubtful at the least that an employee of a corporation and that corporation can conspire where the employee is acting only for the corporation and not for any personal purpose of his own."); *Marmott v. Maryland Lumber Co.*, 807 F.2d 1180, 1184 (4th Cir.1986) *cert. denied*, 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 700 (1987) ("[A] conspiracy between a corporation and its agents, acting within the scope of their employment, is a legal impossibility.") As explained in Mallen & Smith, *Legal Malpractice* § 6.1 (3d ed. 1989), the point is applicable in the context of an attorney-client relationship:

> *Conspiracy.* The general rule is that an attorney acts as an agent of the client, the principal, and the wrongs attributed to the client do not support a conspiracy. Sometimes, however, an attorney's claimed liability has been predicated upon participating with others as a conspirator or as an aider and abettor ... Liability as a conspirator requires pleading and proof that the attorney's participation involved more than legal representation.

(Emphasis supplied.)

▪ The plaintiff carries the burden of proving that the attorney's self interest went beyond the scope of his employment as an advisor to his client. *Worldwide Marine Trading v. Marine Transport Serv.*, 527 F.Supp. 581, 583 (E.D.Pa.1981). Therefore to substantiate a conspiracy claim, the plaintiff must establish that the attorney acted without legal justification and with the intent of injuring. *Likover v. Sunflower Terrace II, LTD.*, 696 S.W.2d 468, 472 (Tex.App.1985). The plaintiff must establish that the attorney did not act within the role of an advisor and merely advise, but instead knew of the client's wrongful conduct and was actively involved in the wrongful conduct. 527 F.Supp. at 585; *See McElhanon v. Hing*, 151 Ariz. 386,

394–95, 728 P.2d 256, 264–265 (Ariz.App.1985), *cert. denied,* 481 U.S. 1030, 107 S.Ct. 1956, 95 L.Ed.2d 529 (1987) (an attorney who participated in a fraudulent transfer by knowingly drafting the stock transfer agreement is chargeable with conspiracy). The jury instruction properly directed the jury's attention to whether the acts of the defendant attorneys were within their roles as advisors to Fraidin.

 Second, there can be no conspiracy where an attorney's advice or advocacy is for the benefit of his client and not for the attorney's sole personal benefit. We have held that to impose liability on an attorney for giving advice regarding a matter of no personal interest to him or her, would be a " 'fundamentally erratical change in the law' which would radically change the nature of attorney-client relationships ..." *Johnson v. Baker,* 84 Md.App. 521, 530, 581 A.2d 48 (1990) (*citing Kartiganer Assoc., P.C. v. Town of New Windsor,* 108 A.D.2d 898, 485 N.Y.S.2d 782, 783–84 (1985) ("attorney not liable for inducing client to breach contract with another if attorney acts on client's behalf and within scope of his authority")); *See Los Angeles Airways, Inc. v. Davis,* 687 F.2d 321, 328 (9th Cir.1982) (An advisor's conduct is privileged when motivated by a desire to benefit the principal, even though such conduct also improves the advisor's own position.)

In light of such law, the jury instruction properly directs the jury to evaluate whether the advice given by the defendant attorneys was solely for the best interests of Fraidin without any benefit to the defendant attorneys.

 Even when an attorney acts within a client's best interest, however, the rights of others must be considered. *Miller v. Ortman,* 235 Ind. 641, 136 N.E.2d 17, 41–2 (1956). The law does require that while an attorney is acting within the scope of his employment, he may not commit fraud or collusion, or a malicious or tortious act, even if doing so is for the benefit of the client. Such actions are beyond the qualified privilege and an attorney is personally liable for them. *Strid v. Converse,* 111 Wis.2d

418, 331 N.W.2d 350, 356 (1983). This is distinguished from mere participation in acts which subsequently make possible the alleged fraud. Such acts are not enough to remove the qualified privilege if the intent to join in the plan is not established. *Steinberg v. Guild,* 22 A.D.2d 776, 254 N.Y.S.2d 7, 9 (1964); *Sharrow v. State Farm Mutual,* 306 Md. 754, 511 A.2d 492 (1986). To remove the qualified privilege, the attorney must possess a desire to harm which is independent of the desire to protect his client. This would constitute actual malice and therefore substantiate a tortious interference with contract claim. *Schott v. Glover,* 109 Ill.App.3d 230, 64 Ill.Dec. 824, 828, 440 N.E.2d 376, 380 (1982).

The jury instructions properly conveyed to the jury the exceptions to qualified privilege that exist when an attorney possesses an improper intent. The instructions advised the jury:

"to overcome the privilege, . . ., the plaintiff must prove by a preponderance of the evidence that the defendant lawyers acted in advising their client with actual malice."

The instruction then defined actual malice and distinguished it from mere advice. The court concluded with the following:

"However, an attorney who has actual knowledge that his client is engaged in unlawful activity may not aid, assist or encourage the carrying on of that unlawful activity"

This instruction, taken as a whole, clearly indicated a distinct difference between permissive advice given to a client under the qualified privilege, and impermissive actions which promote and assist illegal acts of a client or benefit an attorney independently from the client's interest.

### 2. Burden of Proof

Braiterman–Weitzman argue the court erred by not instructing the jury that the lawyer defendants had the burden of proof on the issue of qualified privilege. The court instructed the jury as follows:

"Plaintiffs have the burden of proving each element of each of their claims by what is called a preponderance of the evidence. The defendants have the burden of proving the affirmative defenses also by a preponderance of the evidence. An affirmative defense is a defense which relieves the defendant of liability."

Appellants complain that, although the trial court advised the jury generally as to burden of proof on affirmative defenses, it failed to advise the jury specifically that qualified privilege was an affirmative defense. Following the giving of the instructions, counsel for Braiterman, P.A. and Weitzman noted the following exception to the charge:

"[Counsel]: With regard to the qualified privilege I think your honor has failed to instruct the jury—Well, I know you failed to instruct the jury specifically that the qualified privilege was an affirmative defense and that the lawyers were required to meet that—

Court: You are not correct. I did advise the jury the qualified privilege was an affirmative defense and I indicated that it had to be proven by a preponderance of the evidence."

The charge was sufficient. Although the court mistakenly believed it had stated explicitly that qualified privilege was an affirmative defense, it had, in fact, explained that "[a]n affirmative defense is a defense which relieves the defendant of liability." It was clear from the instructions taken as a whole that qualified privilege was a defense that would relieve the lawyer defendants from liability. It should have been clear to the jury, therefore, that the lawyer defendants had the burden of proof with regard to the issue of qualified privilege.

### 3. Verdict Sheet

Braiterman–Weitzman contend that the verdict sheet was a source of confusion because it could "easily be misread to allow the jury to exonerate both lawyers and the law firms if they found that either one of [them] was acting" pursuant to the qualified privilege. Appellants have not referred

us to any portion of the record evidencing their objection to the verdict sheet, and we did not find such an objection in the record. Because the argument was not made below, we need not address it on appeal. Md.Rule 8–131. Nevertheless, we find the argument lacking in merit. The court gave the following instruction:

"If you should find that *either or both* of the lawyers and their respective law firms were acting within their capacity as legal counsel with a qualified privilege, you are not to answer any further questions *regarding that lawyer and the law firm.*

If you should find that *either or both* of the lawyers and their respective law firms were not acting within their legal capacity with a qualified privilege, proceed to the next question."

(Emphasis added.) Clearly, the instruction indicated that each lawyer and each law firm was to be evaluated separately.

IN THE FIRST APPEAL, AWARD OF PUNITIVE DAMAGES VACATED AND CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; JUDGMENT FOR PREJUDGMENT INTEREST REVERSED; IN ALL OTHER RESPECTS, JUDGMENTS IN FAVOR OF BRAITERMAN, P.A. AND WEITZMAN AFFIRMED. COSTS TO BE PAID 80% BY APPELLANTS AND 20% BY APPELLEES. IN THE SECOND APPEAL, JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANTS.